386 P.2d 374

ONEIDA COUNTY FAIR BOARD, Cassia County Fair Board, Jerome County Fair Board, and Joe Hansen, an individual, Petitioners,

v.

Robert E. SMYLIE, Governor of the State of Idaho, Respondent.

No. 9336.

Supreme Court of Idaho.

Sept. 26, 1963.

Rehearings Denied Nov. 15, 1963.

Elam, Burke, Jeppesen & Evans, Boise, for Oneida, Cassia and Jerome County Fair Boards.

Clemons, Skiles & Green, Boise, for Joe Hansen.

Allan G. Shepard, Atty. Gen., Michael Southcombe, Asst. Atty. Gen., Boise, for respondent.

344

McFADDEN and SMITH, Justices.

The county fair boards of Oneida, Cassia and Jerome counties, and Joe Hansen, a quarter horse breeder, petitioned for a writ of mandate to compel respondent Governor to appoint members of the Idaho Horse Racing Committee, as required by Idaho Sess.Laws 1963, c. 64, designated therein

Z. Reed Millar and Frank E. Chalfant, Sr., Boise, amici curiæ.

as the "Idaho Horse Racing Act," and hereinafter sometimes referred to as the Act. An alternative writ of mandate was issued.

In response to the alternative writ respondent Governor by his return acknowledged enactment of the law providing for creation of the Committee and appointment of its members by him, and that he refuses to appoint the members of such Committee. As grounds for his refusal respondent Governor urges that the Act creating such Committee and authorizing the pari-mutuel system of wagering on horse races is an attempt to authorize a lottery in violation of Idaho Constitution, Art. 3, § 20, which is:

"The legislature shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever."

The Act provides for licensing by the Committee of individual participants in horse racing meets and of persons holding such meets, and exempts fair boards and fair districts from the license requirement. The Act also authorizes a licensee to conduct the pari-mutuel system of wagering at race meets, and declares the use of such system not to be unlawful.

The wagering so permitted is described in the petition as follows:

" * * * The pari mutuel system is a term of art for the mathematical method by which the amounts to be paid to successful patrons are computed. All money paid into the system is paid out to the patrons except for a small percentage retained by the state and fair board pursuant to the act. Odds on a particular horse are determined only by the amount of money paid on such horse by patrons in comparison to other horses in the race.

"In order to successfully determine the outcome of any race, the patron must take into consideration and coordinate the following factors: the number of previous starts of the horse, its wins, its order of finish in current and preceding seasons, the total previous purses won by it; its breeding, age and sex, the distance covered in its most recent races, the time in which the course was completed, the time of the winner, the condition of the track, the weight carried, the stretch called, wind condition, the length behind the leader, the official finish post, the post position, the type of race and the number of starters, the jockey, together with information concerning his record and weight. The track furnishes this information to its patrons. The track in addition groups horses in each race according to their proven ability."

That the Constitution does not prohibit gambling is not questioned by the parties.

They do not contend that wagering on a horse race is violative of the Constitution. Respondent does urge that the enactment of Idaho Sess.Laws 1963, c. 64, designated as the "Idaho Horse Racing Act", is an attempt to authorize a lottery in violation of Idaho Constitution, Art. 3, § 20.

The sole issue in this proceeding is not whether conducting a pari-mutuel system of wagering under the provisions of the Act constitutes gambling, but whether the operation of such a system of wagering on horse races is a lottery within the meaning of the constitutional prohibition.

A legislative act is presumed to be constitutional and all reasonable doubt as to its constitutionality must be resolved in favor of its validity. Robinson v. Enking, 58 Idaho 24, 69 P.2d 603; Eberle v. Nielson, 78 Idaho 572, 306 P.2d 1083; Noble v. Bragaw, 12 Idaho 265, 85 P. 903; Rich v. Williams, 81 Idaho 311, 341 P.2d 432; Padgett v. Williams, 82 Idaho 114, 350 P.2d 353; Caesar v. Williams, 84 Idaho 254, 371 P.2d 241.

The constitutionality of a statute is to be determined without reference to the economic, equitable, or moral effect of the statute, since such are matters of policy exclusively for the legislature. State v. Dingman, 37 Idaho 253, 219 P. 760; State ex rel. Capital Inv. Co. v. Lukens, 48 Idaho 357, 283 P. 527; State v. Holder, 49 Idaho 514, 290 P. 387; State ex rel. Rich v. Idaho Power Company, 81 Idaho 487, 502, 346 P.2d 596, 603; Berry v. Koehler, 84 Idaho 170, 177, 369 P.2d 1010, 1013; Utah State Fair Ass'n v. Green, 68 Utah 251, 249 P. 1016; State ex rel. Martin v. City of Kansas City, 181 Kan. 870, 317 P.2d 806.

In State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328, in holding that the operation of slot machines constituted a lottery, this Court referred to Idaho Constitution, Art. 3, § 20 and, after quoting I C. § 18–4901, stated as follows:

"This definition [of a lottery, I.C. § 18–4901] in substance conforms to that of the common law which has defined a lottery as a species of gaming, wherein prizes are distributed by chance among persons paying a consideration for the chance to win; a game of hazard in which sums are paid for the chance to obtain a larger value in money or articles.

"All lotteries are gambling. To constitute a lottery, as distinguished from other methods or forms of gambling, it is generally held there are three essential elements, namely, chance, consideration and prize. When these three elements are present, the scheme is a lottery. 54 C.J.S. Lotteries § 2 (a), p. 845; 34 Am.Jur. 647, Sec. 3."

Petitioners do not question the conclusion reached in the Garden City case. They

agree that the distribution of prizes by slot machines is the result of chance alone, and that no skill, adroitness, or management on the part of the operator can affect the result. They distinguish the operation of the pari-mutuel system of wagering by asserting that the player, or better—being furnished by the operator of the system with information concerning the breeding, training and experience of the horses, and the weight, experience and ability of the jockey—can, by exercise of his own skill and judgment, forecast, with some degree of certainty, the outcome of the race and can place his bet accordingly. Petitioners acknowledge that the better cannot predict the specific amount of reward to be received should he choose the winning horse, this being particularly true in the early stages of the betting, since the odds are dependent upon the number and amounts of bets placed by other patrons upon the same or other horses entered in the race.

In determining the issue before us it is proper to consider the proceedings of the Constitutional Convention to interpret a provision of the Constitution as nearly as possible consonant with the objects and purposes contemplated at the time of its adoption. Williams v. Baldridge, 48 Idaho 618, 284 P. 203; Wright v. Callahan, 61 Idaho 167, 99 P.2d 961; Higer v. Hansen, 67 Idaho 45, 170 P.2d 411; State v. Village of Garden City, supra.

As originally proposed to the Idaho Constitutional Convention, Art. 3, § 20 of Idaho's proposed constitution read:

"The legislature shall not authorize any *game of chance,* lottery or gift enterprise under any pretense or for any purpose whatever." (Emphasis supplied.)

The proceedings of the Constitutional Convention, Vol. 2, Idaho Constitutional Convention, Proceedings and Debates, pp. 1248–1249, show that the phrase, "game of chance", as first contained in the proposed section of the article was, after discussion, eliminated therefrom. Those proceedings prove conclusively that the framers of our Constitution distinguished a "lottery" from a "game of chance"; otherwise they would not have deleted the phrase "game of chance".

The Legislature enacted this law over respondent Governor's veto by a vote in excess of the required two-thirds majority. Undoubtedly the members of the Legislature were cognizant of the many decisions of the courts of other states regarding the definition of "lotteries" and were no doubt influenced by the conclusions reached by the great majority of the courts which have ruled upon the question.

Appropriate quotations from decisions of states which, under constitutional provisions similar to Idaho Constitution, Art. 3, § 20, ruling upon the question whether the

pari-mutuel system of wagering on horse races constitutes a lottery within the meaning of the particular constitutional prohibition against lotteries, are hereinafter set out.

*Arizona.*

While Arizona has ruled upon the question, its constitution does not appear to contain such a provision; rather its prohibition is by statute, Ariz.St., R.C.1928, § 4676, which in effect declares as unlawful a lottery or lottery scheme or device, or raffle.

We shall examine the decision of Arizona's Supreme Court, and the constitutional provisions and decisions of various other states, holding that the pari-mutuel system of wagering on horse races does not constitute a lottery.

In Engle v. State, 53 Ariz. 458, 90 P.2d 988, the Arizona Supreme Court, in holding that pari-mutuel betting did not constitute a lottery, said:

"Was it then a lottery or raffle? A lottery may be defined as a scheme for the distribution of prizes or other things of value by lot or chance among persons who have paid or agreed to pay a valuable consideration for the chance to obtain a prize. * * * It is the character of the game and not the skill or want of skill of the individual player which determines whether the game is one of chance or skill. The test is not whether it contains an element of chance or element of skill, but is chance the dominating element which determines the result of the game."

Continuing, the Arizona Court, quoting from State v. Gupton, 30 N.C. 271, stated:

" 'It is true, that in these latter instances superiority of skill is not always successful—the race is not necessarily to the swift. Sometimes an oversight, to which the most skilful is subject, gives an adversary the advantage; or an unexpected puff of wind, or an unseen gravel in the way, may turn aside a quoit or a ball and make it come short of the aim. But if those incidents were sufficient to make the games, in which they may occur, games of chance, there would be none other but games of that character. * * * The incidents mentioned, whereby the more skilful may yet be the loser, are not inherent in the nature of the games. Inattention is the party's fault, and not his luck; and the other obstacles, though not perceived nor anticipated, are occurrences in the course of nature and not chances.' "

The Arizona Court then ruled:

" * * * We are decidedly of the opinion that the business conducted by defendants was in no manner a lottery or raffle, although of course it was gambling."

*Arkansas.*

Arkansas Constitution, Art. 19, § 14, reads:

"No lottery shall be authorized by this state, nor shall the sale of lottery tickets be allowed."

The Supreme Court of Arkansas in Longstreth v. Cook, 215 Ark. 72, 220 S.W. 2d 433, upheld a statute legalizing the pari-mutuel system of betting on horse races as not being in violation of Arkansas' constitutional prohibition against lotteries. The Court discussed the pari-mutuel system of horse racing, as follows:

"Horses are selected for entrance in a particular race by the Association, and the horses names are listed or lined up on a daily racing card, and there is sold a racing form which shows the weight carried by each horse and its *handicap* depending on the past performances of the horse in previous races at that or other tracks. *This weight handicap is intended in some measure to equalize the speed of the horses,* and the amount thereof depends upon the horse's record in prior races run within the preceding twelve months. (Emphasis supplied.)

"The owners have trainers who are skilled in handling horses with the purpose of increasing their speed and making them more responsive to the control of the jockeys.

"Many persons attend the races for the thrill of witnessing the horses as they cross the finish line, and add to the thrill and interest by betting on some horse without knowledge of the information disclosed by the form sheets. * * * But sources of information now are provided, * * * by which bettors may bet with more discrimination and with improved chances of selecting or picking a winner.

"These form sheets designate whether upon previous performances a particular horse is a fair mud runner, a good mud runner, or a superior mud runner * * *.

"Followers of racing who for long periods of time have studied the records of the horses choose as their selections the horse which in their opinion will be most likely to win and these are for sale and may be purchased at the track. Neither the Jockey Club nor any one connected with it fixes the odds which will prevail on any horse. The bettors themselves do this and it is done through the number of bets made and the amount thereof on particular horses.

"The animal equation enters into these races just as the human equation enters into sports between men and women. A horse may run better on

one day than on another depending on the condition of the horse and it is the function of the trainer to see that the horses are in the best possible condition and properly trained. *The element of chance necessarily enters into these races but it is by no means controlling.* Other elements of more importance are the condition and the power of endurance of the horse and the skill and daring of its rider. Some jockeys win more races and a higher percentage of the races in which they participate than others. \* \* \*" (Emphasis supplied.)

The Arkansas Court after discussing various decisions of other states concerned with the subject of pari-mutuel horse racing then ruled:

"It appears therefore that to constitute a lottery it is essential not only that the element of chance is present but also that it controls and determines the award of the prize whatever it may be.

\* \* \* \* \* \*

"The use of the pari-mutuel machine does not make the betting a lottery, if it is not otherwise so, as it makes no determination of what horses are winners. It is merely a wonderful machine which expedites calculations which could laboriously be made without its use. Its use in no manner affects the results of a race as it merely calculates the results of the betting after the races have been run and the respective winners announced.

"We conclude, therefore, that while the element of chance no doubt enters into these races, it does not control them, and that there is therefore no lottery."

See also: Scott v. Dunaway, 228 Ark. 943, 311 S.W.2d 305.

*California.*

California Constitution, Art. 4, § 26, provides:

"The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery. \* \* \*"

The appellate department of the Superior Court of the County of Los Angeles in People v. Postma, 69 Cal.App.2d Supp. 814, 160 P.2d 221, ruled that book making on horse races did not amount to the conducting of a lottery within the purview of Cal. Penal Code, sec. 319, prohibiting lotteries. The California Appellate Court relied upon the Arizona, Kentucky, Utah and New York decisions, herein elsewhere discussed. The California Court recognized the three essential elements of a lottery (identically

as did this Court in State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328). The California Court thereupon ruled:

"Under our statute, three elements are necessary to constitute a lottery: (1) The disposition of property,—the prize—, (2) upon a contingency determined by chance, (3) to a person who has paid or promised to pay a valuable consideration for the chance of winning the prize, and upon the understanding that it will be disposed of by chance. People v. Hecht, 1931, 119 Cal.App.Supp. 778, 784, 3 P.2d 399; People v. Cardas, 1933, 137 Cal.App. Supp. 788, 790, 28 P.2d 99; People v. Babdaty, 1934, 139 Cal.App.Supp. 791, 793, 30 P.2d 634; Niccoli v. McClelland, 1937, 21 Cal.App.2d Supp. 759, 762, 763, 65 P.2d 853. If any of these elements is lacking, there is no lottery. People v. Hecht, supra."

*Colorado.*

Colorado Constitution, Art. 18, § 2, reads:

"The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

The Colorado Supreme Court in Ginsberg v. Centennial Turf Club, 126 Colo. 471, 251 P.2d 926, upheld a statute, Colo.S. L. '49, c. 207, legalizing pari-mutuel betting in the State of Colorado, as not in violation of Colorado's constitutional prohibition against lotteries. The Court in so ruling said:

"While an element of chance no doubt enters into horse and dog races, it does not control them. The bettor makes his own choice of the animal he believes will finish the race in first, second or third place. In making that selection he has available the previous records of the animal and the jockey, and various other facts which he may take into consideration in choosing the animal upon which he places a wager.

"Suffice it to say that after careful study of all the authorities, we hold that the conduct of the defendants * * * does not amount to the operation of a lottery or gift enterprise in contravention of the Constitution of this state. We are fortified in this position by numerous decisions of appellate courts throughout the nation, and we are satisfied that the weight of authority is in harmony with this conclusion. Ex parte Pierotti, 43 Nev. 243, 184 P. 209; Commonwealth v. Kentucky Jockey Club, 238 Ky. 739, 38 S. W.2d 987; Iris Amusement Corp. v. Kelly, 366 Ill. 256, 8 N.E.2d 648; People v. Monroe, 349 Ill. 270, 182 N.E. 439, 85 A.L.R. 605; Utah State Fair Ass'n v. Green, 68 Utah 251, 249 P.

1016; Longstreth v. Cook, 215 Ark. 72, 220 S.W.2d 433; Rohan v. Detroit Racing Ass'n, 314 Mich. 326, 22 N.W. 2d 433, 166 A.L.R. 1246; Engle v. State, 53 Ariz. 458, 90 P.2d 988.

"All of the states in which the above cited cases originated have constitutional provisions prohibiting lotteries, which are in substance comparable to the provisions of our own law. Statutes authorizing pari mutuel betting on racing events were held to be valid over the contention that such betting constituted a lottery. This array of well considered decisions leads inescapably to the conclusion that a sound basis in reason and logic exists in support of that construction which upholds the legislation adopted by the people, and which harmonizes that act with the Constitution."

*Illinois.*

Illinois Constitution, Art. 4, § 27, S.H.A., reads:

"The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

The Supreme Court of Illinois in People v. Monroe, 349 Ill. 270, 182 N.E. 439, 85 A.L.R. 605, upheld a statute legalizing the pari-mutuel method of wagering at race tracks as not violative of the constitutional prohibition against lotteries. The Court in so ruling said:

"Every event in life and the fulfillment of every lawful contract entered into between parties is contingent to at least some slight extent upon chance. No one would contend, however, that a contract knowingly and understandingly entered into between two parties is a gaming contract merely because its fulfillment was prevented as the result of the befalling of unknown or unconsidered forces, or by the issue of uncertain conditions, or by the result of fortuity. The pari-mutuel system of betting does not come within the definitions given above. While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a given percentage to the management. The persons among whom the money is to be divided are not uncertain, as they are 'those who bet on the winning horse.' The winning horse is not determined by chance, alone, but the condition, speed, and endurance of the horse, aided by the skill and management of the rider or driver, enter into the result. The amount to be paid by a principal to an agent under a con-

tract to be paid 10 per cent. commission on all sales made by him is dependent in some degree on chance and the happening of many uncertain and contingent events, but the defense that such contract was for such reasons a gambling contract could not be maintained. In our opinion the pari-mutuel system does not come within the constitutional inhibition as to lotteries."

*Kentucky.*

Kentucky Constitution, § 226, reads:

"Lotteries and gift enterprises are forbidden, and no privileges shall be granted for such purposes, and none shall be exercised, and no schemes for similar purposes shall be allowed. The General Assembly shall enforce this section by proper penalties. All lottery privileges or charters heretofore granted are revoked."

In Commonwealth v. Kentucky Jockey Club, 238 Ky. 739, 38 S.W.2d 987, the Kentucky Court of Appeals upheld a statute permitting the pari-mutuel system of betting on horse races. In so doing, the Court discussed conditions prior to or at the time of the adoption of the constitution, and noted particularly the historical absence of any decision holding that wagering on horse racing constituted a lottery, as follows:

"It did not occur to any one during that period that betting on races, elections, or similar forms of wagering constituted a lottery. Indeed, the contention that betting on horse races by the pari mutuel system constitutes a lottery is of recent origin in this state. For nearly half a century the General Assembly and the Court of Appeals have proceeded upon the general understanding that the whole subject of betting and gaming was within the power of the Legislature to prohibit, regulate, or classify, prohibiting in part and permitting in part, according to its view of the public policy to be enforced. * * *

"It might be fairly argued that the weight of authority is to the effect that lotteries do not embrace betting upon horse races by the pari mutuel system. 17 R.C.L. § 16, p. 1230; Reilly v. Gray, 77 Hun 402, 28 N.Y.S. 811; People [ex rel. Lawrence] v. Fallon, 4 App. Div. 82, 39 N.Y.S. 865, affirmed 152 N.Y. 12, 46 N.E. 296, 37 L.R.A. 227, 57 Am.St.Rep. 492; Utah State Fair Ass'n v. Green, 68 Utah, 251, 249 P. 1016; People v. Reilly, 50 Mich. 384, 15 N.W. 520, 45 Am.Rep. 47.

\* \* \* \* \* \*

" * * * We are unable, in the face of the facts recited, to declare that the section of the Constitution condemning lotteries was understood by the people who adopted it as itself out-

**354**

lawing betting upon horse races, by the pari mutuel system, or the other forms of betting. It was then understood, and has been the accepted opinion, that the subjects of betting and gaming were within the absolute control of the police power, possessed by the Legislature. It is the duty and function of the Legislature to discern and correct evils, and evils within that power are not limited to some definite injury to public safety or morals, but embrace the removal of obstacles to a greater public welfare. * * *"

*Louisiana.*

Louisiana Constitution, Art. 19, § 8, LSA, in part provides:

"* * * Lotteries and the sale of lottery tickets are prohibited in this State."

The Supreme Court of Louisiana in Gandolfo v. Louisiana State Racing Commission. 227 La. 45, 78 So.2d 504, upheld a statute creating the Louisiana State Racing Commission and authorizing pari-mutuel wagering on horse races. The Court said:

"Lottery has been defined as a scheme for the distribution of prizes by lot or chance. It is upon that theory that this court has held slot machines, pinball machines and bank nites lotteries within the meaning of certain state statutes and city ordinances. State v. Barbee, 1937, 187 La. 529, 175 So. 50; City of New Orleans v. Collins, 1900, 52 La.Ann. 973, 27 So. 532; State v. Lasselle, 1923, 154 La. 168, 97 So. 389. In a horse race the winner is not determined by chance alone, as the condition, speed and endurance of the horse, and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. In City of Shreveport v. Maloney, 1902, 107 La. 193, 31 So. 702, 703, this court considered the very question raised by plaintiffs under an identical Article (178) of the Constitution of 1898. In that case we said:

"'* * * We have no hesitation in saying that the law denouncing lotteries (article 178 of the constitution) is in force, for it is not limited, as is article 188 of the constitution against gambling. It (article 178, Const.1898) announces the policy of the state as being against lotteries, and makes it an act repugnant to the peace and good order. The business of the defendants has never been considered a lottery, and, as conducted, is not a lottery. The basis of the business of turf exchanges is the running of horses and the betting on the result. To an ex-

tent, at least, these acts have received legal sanction, as expressed in one of the articles of the Civil Code (article 2983). The right to recover a bet on the result of a horse race has been recognized. * * *'"

The Louisiana Court then discussed various cases decided by other courts; it relied particularly upon the cases decided by the Supreme Courts of Michigan and Utah (herein elsewhere discussed).

*Michigan.*

Michigan Constitution, Art. 5, § 33, reads:

> "The legislature shall not authorize any lottery nor permit the sale of lottery tickets."

People v. Reilly, 50 Mich. 384, 15 N.W. 520, decided in 1883, is one of the earliest cases upholding wagering on horse races as not being in contravention of the lottery prohibition of the constitution. In that case the Michigan Supreme Court said:

> "The offense which the recorder finds respondent to have committed consisted in what seems to be commonly known as pool-selling, and the facts indicate that the pools were made up of amounts bid for the privilege of selecting horses out of those running in races, and of bets of as many as saw fit to do so, by purchasing checks deposited on baseball matches, where those who bet on the winning combination received the pool. * * *
>
> * * * * * *
>
> "By the Constitution of 1835 (art. 12, § 6) it was provided that 'no lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed.' * * *
>
> * * * * * *
>
> "* * * We think that it would be straining the law to include such acts as those of the respondent within the category of lotteries, and therefore we must treat the case as one which has not been placed by the legislature under the classification of offenses which should be left to be dealt with by the municipal by-laws and ordinances, as well as by state laws."

The Supreme Court of Michigan again in Rohan v. Detroit Racing Ass'n, 314 Mich. 326, 22 N.W.2d 433, 166 A.L.R. 1246, ruled that wagering on horse races—this time under the pari-mutuel system—was not violative of Michigan's constitutional prohibition against lotteries. In so holding the Court said:

> "We are convinced that under the great weight of authority, pari-mutuel betting on horse races is not a lottery. Webster's New International Diction-

ary (2d Ed.) defines a lottery as follows:

" 'A scheme for the distribution of prizes by lot or chance; * * * a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, usually as determined by the numbers on tickets as drawn from a lottery wheel.'

"Said dictionary defines pari-mutuel as 'a form of betting on horses in which those who bet on the winning horse share the total stakes, less a small per cent to the management.' It describes a pari-mutuel machine as 'a machine for registering and indicating the number and nature of bets made on horse races, used in the pari-mutuel system of betting.' "

The Michigan Supreme Court was concerned with the same and only issue as is presented in the case at bar, viz., that of the constitutionality of the pari-mutuel horse racing act. In ruling the act to be not violative of the constitutional prohibition against lotteries, the Michigan Court, after analysis of the various authorities, said:

" * * * it is clear that pari-mutuel betting on a horse race is not a lottery. In a lottery the winner is determined by lot or chance, and a participant has no opportunity to exercise his reason, judgment, sagacity or discretion. In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. The pari-mutuel method or system of betting on a horse race does not affect or determine the result of the race. The pari-mutuel machine is merely a convenient mechanical device for recording and tabulating information regarding the number and amount of bets (Utah State Fair Ass'n v. Green, supra) [68 Utah 251, 249 P. 1016], and from this information the betting odds on the horses entered can be calculated and determined from time to time during the process of betting. * * * The fact that a better cannot determine the exact amount he may win at the time he places his bet, because the odds may change during the course of betting on a race, does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion in selecting the horse he thinks will win. Horse racing, like foot racing, boat racing, football, and baseball, is a game of skill and judgment and not a

game of chance. Utah State Fair Ass'n v. Green, supra."

The Michigan Court quoted from the Illinois case of People v. Monroe, 349 Ill. 270, 182 N.E. 439, 85 A.L.R. 605, as follows:

" * * * While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a given percentage to the management. The persons among whom the money is to be divided are not uncertain, as they are 'those who bet on the winning horse.' The winning horse is not determined by chance, alone, but the condition, speed, and endurance of the horse, aided by the skill and management of the rider or driver, enter into the result. * * * In our opinion the pari-mutuel system does not come within the constitutional inhibition as to lotteries.

\* \* \* \* \* \*

" '* * * [i]n horse racing the horses are subject to human guidance, management, and urging to put forth their best efforts to win.' "

*New York.*

New York Constitution, Art. 1, § 9, in part provides:

"No law shall be passed * * *; no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling, * * * hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section." .

The early New York case of Reilly v. Gray, 77 Hun 402, 28 N.Y.S. 811, decided in 1894, ruled that selling pools did not constitute lotteries within the prohibition of New York's constitution, and that a New York statute authorizing such pool selling on races was constitutional.

Respondents point to the New York case of Irving v. Britton, 8 Misc. 201, 28 N.Y.S. 529, which held that a pool selling operation similar to pari-mutuel was a lottery and therefore repugnant to the Constitution. Eighteen days later Reilly v. Gray, supra, issued which in effect annulled the ruling in the former decision.

Another New York case often cited is the early case of People ex rel. Lawrence v. Fallon, 4 App.Div. 82, 39 N.Y.S. 865, decided in 1896, which held that wagering on horse racing was not a lottery. In arriving at such decision the New York Court said:

" * * * The essential quality of a lottery is that the distribution of the prize shall depend entirely upon chance, and that so far as possible, if the lottery is honestly conducted, no other element whatever shall enter into it.

There certainly is a wide distinction between the wager of money upon the result of any game and the purchase of shares in a lottery. To a certain extent, it may be said that what is called 'chance' enters into the result of any game even the game of chess, and that nothing which is the result of a contest or competition is decided without some other element entering into it than the mere skill of the persons who take part in the contest. Everybody recognizes that in a baseball game or a game of football, or in running or walking matches, the result depends, not alone upon the skill and strength and agility of the competitors, but upon numerous incidents which may or may not occur, and whose occurrence depends upon something which nobody can predict, and which, so far as human knowledge is concerned, have no reason for existing. This is a chance, pure and simple; but yet the result of those games cannot in any just sense be said to be a lottery. The distinction we apprehend to be that, in a lottery, no other element is intended to enter into the distribution than pure chance; while, in the result of other contests which are forbidden under the act against betting or gaming, other elements enter, and the element of chance, although necessarily taken into consideration, may be and is eliminated to a very considerable extent by the skill, careful preparation, and foresight of the competitors. It is quite clear that the law has always recognized the distinction between betting upon horse races and the establishment of lotteries. * * * "

*Oregon.*

Oregon Constitution, Art. 15, § 4, reads:

"Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws."

Multnomah County Fair Ass'n v. Langley, 140 Or. 172, 13 P.2d 354, was a declaratory judgment action; therein the Supreme Court of Oregon ruled that a place, whereby the fair association solicited contributions and used the sums so obtained to offer prizes in horse races, discharge expenses, and create a fund for distribution among contributors selecting the winning horses, was not a lottery within the meaning of Oregon's Constitution, nor Oregon Code 1930, section 14–801, prohibiting lotteries. In so holding the Court reviewed the decisions, which it considered well reasoned, decided in Kentucky and Utah, as follows:

" * * * In Commonwealth v. Kentucky Jockey Club, 238 Ky. 739, 38 S.W. (2d) 987, 994, the court held that statutes of that state, under which the state racing commission had granted licenses to jockey clubs to hold races under the

pari-mutuel system, did not conflict with the provision of the Kentucky Constitution (section 226) which provided: 'Lotteries and gift enterprises are forbidden. * * * The general assembly shall enforce this section by proper penalties. * * *' The court was of the opinion that 'gaming, betting, and lotteries are separate and distinct things in law and fact,' and readily conceded that all of them were within the power of the Legislature to prohibit, regulate, or classify, but was of the opinion that, when the Kentucky Constitution was adopted, 'it did not occur to any one during that period that betting on races, elections, or similar forms of wagering constituted a lottery.' In Utah State Fair Ass'n v. Green, 68 Utah, 251, 249 P. 1016, the Supreme Court of that state, acting under the Declaratory Judgment Statute (Laws, 1925, c. 77), held that an act of that state, which provided that 'bets or wagers made under the co-operative or pari-mutuel system of betting and wagering shall not be unlawful' (section 6) when the race was conducted under the supervision of the state racing commission, was not in conflict with the provision of the Utah Constitution (article 6, § 28) which provided: 'The Legislature shall not authorize any game of chance, lottery or gift enterprise under any pretense or for any purpose.'

In arriving at its conclusion the court was persuaded by the fact that the outcome of a horse race is not dependent upon mere chance, but upon other factors which are more or less manifest, and was also persuaded by the circumstance that, when the above-mentioned provision of the Utah Constitution was being debated before the constitutional convention, its proponent stated that it would not have the effect of prohibiting betting upon horse racing. Since various other decisions which have likewise held that betting upon horse races does not constitute a lottery are reviewed or cited in the aforementioned Utah and Missouri decisions, we shall not repeat the citations herein."

Continuing, the Supreme Court of Oregon observed:

"It seems clear that, when the plaintiff formulated its plan, it did not intend to set up a lottery. It also seems clear, from allegations of the complaint which we have not quoted, that one of the purposes of the plaintiff was to add interest to the breeding of good horses and that it intended that the predominant feature in its plan should not be chance but skill, judgment, and horsemanship. * * *"

Likewise, it appears from the petition in the case at bar, that petitioners do not intend to set up a lottery, that they intend to

add interest to this breeding of good horses, and that the predominant features in the pari-mutuel plan shall be skill, judgment and horsemanship, and not chance.

*Texas.*

Texas Constitution, Art. 3, § 47, Vernon's Ann.St., reads:

"The legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States."

In Panas v. Texas Breeders & Racing Ass'n, Inc., 80 S.W.2d 1020, the Texas Court of Civil Appeals held that the certificate system of betting on horse races, which is similar to the pari-mutuel system, did not violate the lottery prohibition of the Texas constitution. In so holding the Court said:

"We do not think the certificate system of betting on horse races can be called a lottery, as that term is used in section 47, article 3, of our Constitution, which prohibits 'the establishment of lotteries * * * or other evasions involving the lottery principle, established or existing in other States.' The Legislature in enacting the certificate system of conducting horse racing did not consider such legislation a vio-

lation of our constitutional prohibition against conducting lotteries. The construction placed by the Legislature upon the constitutional prohibition against conducting a lottery in this state will not be set aside by the courts unless in their opinion such construction is clearly wrong, and we cannot so hold in this case. State ex rel. Guerguin v. McAlister, 88 Tex. 284, 287, 31 S.W. 187, 28 L.R.A. 523; Whitener v. Belknap, 89 Tex. 273, 34 S.W. 594."

*Utah.*

Utah Constitution, Art. 6, § 28, reads:

"The Legislature shall not authorize any game of chance, lottery or gift enterprise under any pretense or for any purpose."

Utah State Fair Ass'n v. Green, 68 Utah 251, 249 P. 1016, was a declaratory action brought for the purpose of testing the validity of Utah Law '25, c. 77, permitting the pari-mutuel system of betting at horse races. In that case, the Utah Supreme Court answered the question "Is horse racing, as contemplated in section 6 of the act, a game of chance?" The Court made an exhaustive analysis of the various definitions of "games of chance" and the then available decisions bearing upon the subject matter under consideration. After pointing out that the pari-mutuel device, while a recording device, *is not used to play the game*

of horse racing, and performs no function in determining the result of the game, the Utah Court said:

"In the opinion of the court, if games such as horse racing, baseball, billiards, chess, and other games in which there is a basis for the exercise of judgment, learning, experience and skill, must be classed as games of chance, even though there may be an element of chance, then we are unable to determine what constitutes a game of skill as contradistinguished from a game of chance. Unless we apply the rule * * [citations], and determine the question by ascertaining which is the dominating element of the game, then there is no reasonable rule by which the question can be determined.

"In the instant case * * * *the result of the race is determined by the race itself, and not by any machine* or other device. Everything else being equal, the fastest horse will be the first to reach the goal. * * * But the amount of each better's winnings cannot be foretold at the time he registers his bet. The number of persons who may bet afterwards at the same machine is unknown. This, it would seem, is an element of chance, at least to a limited extent. It is not an element of chance as to the amount he may lose, but only as to the amount he may win. If his horse wins, he knows in advance that he cannot lose more than 10 per cent. of the amount he has bet, and that could only occur in case every better bet on the same horse. * * * So that the chance feature of the game has nothing to do with whether the better wins or loses the race, for, as before stated, that depends on the race itself, independent of the pari-mutuel machine. Neither does the chance feature in any manner affect the amount he will lose, for this he can foresee at the time he registers his bet. (Emphasis supplied.)

"It seems to the court that the dominating element of the game is the race itself. * * *"

The Utah Supreme Court then turned to the proceedings of the Utah Constitutional Convention, vol. 1, pp. 937–938, wherein it is shown that the convention rejected a motion to strike from the Utah constitution the prohibition against lotteries. In the colloquy on the subject matter, Mr. Evans, the President of the convention, was opposed to deleting the lottery prohibition. He was asked by Mr. Hammond, a member of the convention, "Will this prohibit horse racing?" to which Mr. Evans replied, "No; it will not according to the construction of the courts." The Utah Court then pointed out that Mr. Evans was a lawyer of recognized ability; that four other lawyers par-

ticipated in the discussion, and that none of them challenged the correctness of Mr. Evans' statement; whereupon the motion to strike was rejected. Continuing, the Utah Supreme Court said:

"It goes without saying that the constitutional convention was not considering inhibiting games of chance played just for amusement. Betting and gambling was what it had in mind; otherwise, the proceeding would have been downright piddling. So that, whatever force or effect this colloquy may be entitled to in determining the intention of the convention, it must, in all fairness, be conceded that it had in mind the question of gambling on a game of chance, and also the question as to whether or not horse racing was included. * * *

"In view of the limitations imposed upon this court in passing upon the constitutionality of an act of the Legislature, as well as in view of the investigation we have made of the subject, we are not warranted in holding that the trial court erred in finding that section 6 of the act (chap. 77, Laws 1925) is not in contravention of the state Constitution."

Particularly, Justice Straup in his concurring opinion advanced a cogent argument of which we must be fully cognizant and apply in the case at bar; said Justice Straup:

"We must take the Constitution as we find it, neither enlarging nor detracting from it. It merely provides that the Legislature shall not authorize 'any game of chance, lottery, or gift enterprise.' It does not forbid the Legislature authorizing betting, wagering, or gaming. * * * The wisdom of the Legislature authorizing or permitting betting or wagering of any kind, whether on a game of skill or otherwise, or on any event, or to permit any kind of public betting or wagering, may well be questioned, and concerning which minds of men may well differ. * * * But the question of wisdom is one of legislative policy over which we have no control.

"The Legislature may adopt any kind of policy not forbidden by the Constitution, and whether a given policy adopted by it not so forbidden is wise or unwise, wholesome or unwholesome, moral or immoral, are questions exclusively within the province of the Legislature. Hence betting, wagering, and gaming not being forbidden by the Constitution, it is competent for the Legislature to authorize and permit or to forbid and prevent any and all kinds of betting, wagering, or gaming, whether private or public."

Justice Straup set forth in cogent form a summary of the pari-mutuel system as follows:

"* * * the pari-mutuel method or system of betting in no particular determines or affects the result of the race. It is merely a convenient means by the use of levers and mechanical appliances of registering, recording, and tabulating the bets and a ready means of displaying in the stages or progress of the betting the number and kinds of bets, all of which may as well, though perhaps not as conveniently, be done by charts and blackboards. The same kind of system, with proper variations, might be used in betting on games of football or baseball, or on any other kind of contest with a number of contestants, but usually when employed is, so far as made known to us, applied to horse racing only. It so is defined by lexicographers. The device used in the pari-mutuel system of betting is not like a slot machine, or roulette wheel, or other similar device or instrument which by its manipulation or operation itself determines the result. The device merely registers or records and displays the bets as they are made. It is a mere posting of them. They could as well be marked by chalk or pencil on a board or chart displayed in a conspicuous place, and by the use of the one no more than by the other system is the result of the race determined nor the character of it as to skill or chance influenced or affected. Thus I think the respondents misconceive and misstate the main proposition for consideration when they say, as they do, that 'the precise question here is whether the pari-mutuel system of betting or wagering upon horse races where the horse races are operated in connection with and as a part of the pari-mutuel system is a game of chance.' As I conceive the proposition, it is: Is horse racing a game of chance or a game of skill? If it is a game of chance, that is the end of the inquiry. If it is a game of skill, is it rendered a game of chance by permitting betting or wagering, whether by the pari-mutuel system or by any other method, on the result of the race? Since betting or wagering on the race does not determine or affect the result of it, I think the conclusion inevitable that wagering or betting on the result of a game of skill does not convert the game into one of chance. As well say that, while football is a game of skill, yet if wagering or betting on the result of the game is permitted, it becomes a game of chance. Horse racing thus being a game of skill and not a game of chance, it was competent for the Legislature to authorize, permit, and regulate it, which really no one disputes. Nor

does any one seriously question the wisdom of some sort of legislation on the subject. What in fact is questioned amounts not to legislative power but legislative wisdom in permitting public betting and wagering on horse racing, or on any other game though of skill. On that subject the respondents, and all those in accord with them, must seek legislative, and not judicial relief."

Both amicus curiae and respondent point to the following cases in support of their position that the operation of a pari-mutuel system of conducting a horse racing contest constitutes a lottery. State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co., 18 Neb. 851, 226 N.W. 705; Opinion of the Justices, 249 Ala. 516, 31 So.2d 753; State ex rel. Moore v. Bissing, 178 Kan. 111, 283 P.2d 418; Pompano Horse Club v. State, 93 Fla. 415, 111 So. 801, 52 A.L.R. 51; Tollett v. Thomas (1871), 6 Q.B. 514.

The Nebraska opinion of State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co., supra, supports respondent's position. The constitutional provision in effect at the time of that decision provided:

"The legislature shall not authorize any game of chance, lottery, or gift enterprise; under any pretense, or for any purpose whatever." Const. Art. 3, § 24.

A Nebraska statute, Laws 1921, c. 159, § 3, provided for a racing commission authorized to conduct horse races. It further provided:

" 'Any association or corporation, person or persons, or the owners of the horses engaged in such races, or others may contribute to purses or funds that shall be distributed on the basis of the result of the races, or prizes or stakes that are to be contested for, subject to the rules and regulations as fixed by the commission governing such contests.' * * * "

The defendant operated a pari-mutuel system of betting on horse races contending that the quoted portion of the statute authorized it. The state brought the action to restrain the operation. The Nebraska Supreme Court held that the quoted statute did not authorize the pari-mutuel system or other form of unlawful gaming, lottery or gambling, and it further stated:

"The pari-mutuel system of betting and gambling on horse races, as operated by defendant and shown by the petition, contains every element of a criminal lottery—consideration, chance, price, means of disbursement. The contentions of defendant that there is in Nebraska no statute against betting on horse races and that defendant is violating no law, are, therefore, wholly without merit. When betting and gambling are conducted in the form, substance and livery of a criminal lot-

tery they are unlawful and those who conduct them are amenable to the statute forbidding and penalizing lotteries. Neither the Legislature nor the state racing commission had power to authorize defendant to operate a lottery in the guise of betting and gambling, or in any other form."

Subsequent to rendition of that opinion Nebraska's Constitution was amended to authorize pari-mutuel betting. Nebr.Const. Art. 3, § 24, as amended.

In State ex rel. Moore v. Bissing, supra, the Supreme Court of Kansas held that pari-mutuel systems of wagering in connection with dog racing constituted a lottery. The constitutional provision of that state provided: "Lotteries and the sale of lottery tickets are forever prohibited." Art. 15, § 3. The defendant contended that the pari-mutuel system of betting as conducted was authorized by an exception contained in a statute making unlawful the maintenance of a place for betting or wagering; the exception provided:

"* * * except within the inclosure of a race track and upon races or trials of speed being conducted within said inclosure (provided that the exception herein shall not apply to any race track or inclosure for more than two weeks in any one year), * * *."

The defendant's contention was rejected. The Court held that all elements of a lottery were present; that the exception purporting to legalize pari-mutuel betting was beyond the power of the legislature to enact and that such exception to the general lottery statute was void as being in contravention of the prohibition against lotteries.

In Pompano Horse Club v. State, supra, the Florida Supreme Court held that the conducting of the sale of certificates under the parti-mutuel betting plan in conjunction with a horse race, constituted engaging in a game of chance, and likewise gambling, contrary to the statutory prohibition. At that time (1927) there was no statutory authorization for pari-mutuel betting. In 1931, in the face of Florida Const. Art. 3, § 23, F.S.A.,—which provides: "Lotteries are hereby prohibited in this State."—the Florida legislature adopted a statute providing for a state racing commission, and authorization of pari-mutuel betting.

This Court has been cited no cases from the Florida jurisdiction interpreting the 1931 act, in view of the constitutional provision.

Alabama Constitution, Art. 4, § 65, provides:

"The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery * * *."

The Supreme Court of Alabama, pursuant to legislative request, rendered an opinion as to the validity of a proposed legislative enactment, the purpose of which would have been to create a state racing commission and provide for pari-mutuel betting under the authority of such proposed legislation. Opinion of the Justices, (1947) 249 Ala. 516, 31 So.2d 753. That Court in a 4 to 3 decision held that such proposed legislation violated the constitutional provision and would constitute an unlawful enactment. The majority opinion cited among others the Florida case of Pompano Horse Club v. State, supra, and relied heavily for its conclusion on that case, together with the English case of Tollett v. Thomas, (1871) 6 Q.B. 514. Justice Lawson in his dissenting opinion, points out:

"* * * The English case of Tollett v. Thomas, supra, was decided in 1871 and also supports the conclusion reached by the majority of the Justices. In so far as my research discloses the English case has been followed in this country on the point here involved only in the case of State v. Lovell, supra [39 N.J.L. 458]. The Nebraska case to which the majority opinion refers held that the essential ingredients of a lottery—consideration, chance, and a prize—were embraced in the pari-mutuel system and forbidden by the laws of that state. But the distinction between a lottery and other methods of gambling was not discussed because the constitution and laws of that state applied equally io both subjects. But Section 24, Art. III of the Nebraska Constitution as now amended permits legislation legalizing pari-mutuel wagering on horse races."

The Supreme Court of Alabama was faced with a similar problem in 1961 when again the House of Representatives of that State requested another advisory opinion on proposed legislation, this time pertaining to authorization of a racing commission and authorization of pari-mutuel wagering on dog races. Opinion of the Justices, (1961), 272 Ala. 478, 132 So.2d 142. No majority opinion was reached. Three justices were of the opinion the proposed bill would not violate the constitutional prohibition against lotteries; three justices were of the opinion it would, and one justice declined to answer on the ground such opinion would be based on surmise or conjecture as to factual details.

Counsel for respondent and amicus curiae rely on and cite Tollett v. Thomas, 6 Q.B. 514, as did the majority opinion of the Supreme Court of Alabama, in Opinion of the Justices, supra, dealing with pari-mutuel betting on horse racing. In the Tollett case the defendants operated a pari-mutuel machine at a race course. They were convicted under the English statute against gaming (31 and 32 Vict. c. 52, S. 3), and not

under one of the statutes against lotteries, (e. g. 10 & 11 Will. 3, c. 17, Chitty's English Statutes, Sixth Ed., vol. V, 45). Tollett v. Thomas was reversed in part in Attorney-General v. Luncheon and Sports Club, Ltd., (1929) A.C. 400, wherein it was decided that proprietors of a pari-mutuel machine were not involved in gaming or wagering. In Everett v. Shand, (1939) 2 K.B. 522, the justices held that the payment of money by patrons to proprietors of a pari-mutuel machine used in conjunction with dog racing did not constitute gaming, one of them stating: "I do not think it can be said that dog racing, any more than horse racing, is a game of chance." In that opinion the justices all considered the decision of Tollett v. Thomas to have been overruled by the case of Attorney-General v. Luncheon and Sports Club, Ltd., supra.

The English decisions carefully distinguish between "gaming" and "lotteries" as those terms are used in their statutes and, in so far as "lotteries" are concerned, hold that a contest is not a lottery unless resolution of the issue depends entirely on chance. Caminada v. Hulton, (1891) Queens Bench Division, 17 Cox C.C. 307; Hall v. Cox, (1899) 1 Q.B. 198. In Scott v. Director of Public Prosecutions, (1914) 2 K.B. 868, Lush, J., stated:

"The word 'lottery' indicates clearly enough what is the offence aimed at by the statute, and the Act has been interpreted in accordance with the obvious meaning of the term as applying only to distributions of money by chance, and nothing but chance, that is, by doing that which is equivalent to drawing lots. If merit or skill plays any part in determining the distribution, there has been no lottery, and there is no offence * * *."

See also: Coles v. Odhams Press, Limited, (1936) 1 K.B. 416; Challis v. Warrender, (1930), 29 Cox C.C. 251.

In cases of first impression, such as the instant one, we recognize that the decisions from sister states are not controlling. This Court, however, may consider not only the decisions from the sister states, but also the statutory and constitutional authority governing such decisions; and then, if and when there are two lines of authority, it is eminently proper for this Court, as an aid in arriving at its decision, to select and apply to the case under consideration that line of decisions which reflects the soundest reasoning in the premises, consonant with our statutory and constitutional provisions, regardless of any numerical weight of authority. 21 C.J.S. Courts, § 204, p. 354; 14 Am.Jur. 299, Courts, § 85; State ex rel. Todd v. Yelle, 7 Wash.2d 443, 110 P.2d 162; McLaughlin v. Housing Authority of City of Las Vegas, 68 Nev. 84, 227 P.2d 206; Oceanside Union School Dist. of San Diego County v. Superior

Court of San Diego County, 58 Cal.2d 180, 23 Cal.Rptr. 375, 373 P.2d 439.

■ Our review of the numerous authorities cited by the eminent counsel appearing for the parties of record and as amicus curiae, with due regard accorded to the historical development of the English cases discussed, and the authorities from which we quote decided by our sister states, leads to the conclusion that a horse racing meet where the pari-mutuel system of wagering is used does not contravene the constitutional prohibition against lotteries. It is our firm opinion that the weight of authority in the United States (as well as in England) is in accord with that conclusion, based upon well grounded logical foundations, keeping in mind the historical distinction between "lottery" and "game of chance" as it has been developed.

Idaho Sess. Laws 1963, c. 64, is not in contravention of the prohibition of Idaho Const. Art. 3, § 20, inasmuch as the pari-mutuel system of wagering on horse racing meets, as provided in that chapter, is not one solely based on chance, which constitutes an essential requisite of a lottery.

The alternative writ of mandate is made permanent.

KNUDSON, C. J., and McQUADE, J., concur.

TAYLOR, Justice (dissenting).

Petitioners distinguish the operation of the pari mutuel system from the operation of slot machines, involved in State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328, by asserting that the player or better in the pari mutuel operation can, by exercise of his own skill and judgment, forecast the outcome of the race, and thus place his bet without resort to chance, or with a minimum of reliance upon the element of chance. They acknowledge that the better cannot forecast the amount of the reward he will receive should the horse he chooses be a winner, particularly in the early stages of the betting, because the odds are dependent upon the number and amounts of bets placed by other patrons upon the same and other horses entered. They urge, however, that the element of chance involved is a minor one and that the element of skill and judgment dominates and largely controls the result.

In this case, no significance can be attached to the proceedings of our constitutional convention in which the words "game of chance" were stricken from the original draft of § 20, Art. 3, of our Constitution. II Constitutional Convention 1248 .. That action was taken on motion of delegate Ainslie, from Boise county, where mining by Chinese was then the principal industry. Certain games of chance were engaged in

by the Chinese at that time. These games were licensed and the license fees were paid into the county school fund. It was Mr. Ainslie's desire to continue such licensing for the benefit of the school fund. The games were not named or described, and no mention was made of pari mutuel or any other such game.

The proceedings of the Utah convention were to the contrary effect. In Utah State Fair Ass'n v. Green, 68 Utah 251, 249 P. 1016, the court called attention to the fact that the constitutional convention adopted the prohibition against lotteries after being assured by a lawyer-delegate that the provision would not prohibit horse racing. The assurance was given in response to a question by a delegate who mentioned betting on such races.

As appears from the definition of "lottery" as accepted by this court in the Garden City case, "game of chance" and "lottery" are practically synonymous. Speaking of "games of chance" in State v. Gupton (1848) 30 N.C. (8 Ired. L.) 271, the North Carolina court said:

"'* * * Therefore it is apparent that those games are specified in contradistinction to other games which are not games of chance. In other words, those terms must be understood in their plain, popular sense, as descriptive of a certain kind of games of chance in contradistinction to a certain other kind, commonly known as games of skill. Though our knowledge of such subjects is very limited, yet we believe that, in the popular mind, the universal acceptation of "a game of chance" is such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness have honestly no office at all, or are thwarted by chance. As intelligible examples, the games with dice which are determined by throwing only, and those in which the throw of the dice regulates the play, or the hand at cards depends upon a dealing with the face down, exhibit the two classes of games of chance. A game of skill, on the other hand, is one in which nothing is left to chance; but superior knowledge and attention or superior strength, agility, and practice, gain the victory. Of this kind of games chess, draughts or checkers, billiards, fives, bowls, and quoits may be cited as examples.'" Annotation—Games of Chance or Skill, 135 A.L.R. 110.

In Pompano Horse Club v. State, 93 Fla. 415, 111 So. 801, 52 A.L.R. 51, the Florida court observed that in Arkansas (State v. Vaughan, 81 Ark. 117, 98 S.W. 685, 7 L.R.A.,N.S. 899, 118 Am.St.Rep. 29, 11 Ann.Cas. 277) and in Kentucky (Cheek v. Com., 79 Ky. 359; City of Louisville v. Wehmhoff, 116 Ky. 812, 76 S.W. 876, id.

116 Ky. 845, 79 S.W. 201) the courts, although recognizing that the weight of authority was against their position, held that horse racing was a game of skill, because that was a decided principle of long standing in those jurisdictions. After stating that it was unnecessary to decide whether horse racing in itself was a game of chance, the Florida court said:

"* * * Regardless of whether horse racing, within itself, is a 'game' or a 'sport,' or, if a game, whether it be one of 'skill' or of 'chance'—when a group of persons, each of whom has contributed money to a common fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horses being paid from the fund so accumulated more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore receive nothing, that process becomes a 'game of chance,' * * *." 111 So. at 812, 52 A.L.R. at 68.

In the early case of Tollett v. Thomas (Eng.1871) 6 Q.B. 514, 521, the court reasoned that pari mutuel betting on horse races was a game of chance as follows:

"In the present instance, an element of chance is introduced, which, though not having any reference to the main event—namely, the result of the race in the winning of a particular horse— is yet essential to making the wager laid upon the winning horse profitable to the better. The winning of the horse betted upon is of course the primary condition of the wager being won; but whether the winning of the wager shall be productive of any profit to the winner, and more especially what the amount of that profit shall be, depends on the state of the betting with reference to the number of bets laid on or against the winning horse— a state of things fluctuating from one minute to another throughout the duration of the betting. Now this being something wholly independent of the issue of the race, as well as of the will and judgment of the winner, depending, as it does, on the will or caprice of the other persons betting, is a matter

obviously of uncertainty and chance to the individual better, more especially in the earlier stages of the betting. There being, then, this element of chance in the transaction among the parties betting, we think it may properly be termed, as amongst them, a game of chance."

In Opinion of the Justices (1947) 249 Ala. 516, 31 So.2d 753, 755, the court summarized the reasoning by which courts in other jurisdictions arrived at the conclusion that pari mutuel betting was not a lottery, as follows:

"* * * The general theory of these authorities is that the form of wagering sought to be legalized in the present bill does not make the betting a mere game of chance since the better can exercise his reason, judgment and discretion in selecting the horse he thinks will win and that horse racing, like foot racing or boat racing, is a game of skill and judgment and not a game of chance. It is pointed out that in a horse race the winner is not determined by chance alone as the condition, speed and endurance of the horse and the skill of the rider are factors affecting the result of the race."

The Alabama court concluded:

"Upon consideration of the matter, however, we conclude that the element of chance is so present. in the form of pari-mutuel betting as to make that system with its paraphernalia, etc., a 'lottery' within the meaning of the constitution of this state. It is true that the result of the race may be determined by the qualities of the horse and rider, but the amount which the better will receive, if the horse of his choice wins, is purely a matter of chance."

In State ex rel Moore v. Bissing (1955) 178 Kan. 111, 283 P.2d 418, 423, the Kansas court was concerned with the operation of the pari mutuel system at dog races. After referring to the three elements of lottery—consideration, chance and prize—the court said:

"* * * [w]hat, then, is the *chance* involved? The answer is very simple. In the first place, there is no guarantee that a certain dog is going to win, and neither is there any guarantee that a bettor will always pick a winner. In placing a wager the bettor takes a 'chance' that he is picking the right dog. In the second place, under the pari-mutuel system of betting every bettor takes a 'chance' on the *amount* he will win, even though his dog finishes in the exact position he bet that he would, for the reason that under this system the exact 'odds' on a particular dog to 'win, place or show' cannot be determined until the betting is closed and information regarding the

number and amount of bets is tabulated by the pari-mutuel machine, which, in the last analysis, is simply a device for calculating the odds.

"Defendant's argument to the effect that the outcome of the race itself, and human knowledge, skill and experience, the condition and speed of the dog whose efforts, together with the efforts of persons charged with the breeding, training and handling of such animals, are the sole factors which determine the recipient and amount of the prize, and that no element of 'chance' is thus involved, simply does not take into account the practical everyday realities of human instincts and life."

In the foregoing decisions the courts rely heavily upon the element of chance and uncertainty involving the amount which the holder of a winning ticket will receive from the pari mutuel system. That, however, is not the only uncertainty, hazard, or chance upon which the moneys to be distributed by the system at the conclusion of the race is determined. Horse racing itself is a "sport" or a "game" in which the winning horse is determined by the breeding, stamina and training of the horse, and the skill, experience and management of the owner, trainer and jockey. It is to be regarded as a game of skill; and the racing of horses for a "purse" or

"prize" payable to the owner, trainer or jockey of the winning horse, is not a lottery. If the owners, trainers and jockeys were the only persons placing bets in the pari mutuel operation, the outcome and the prizes to be distributed might logically be said, in some measure, to result from the application of their skill and judgment. But, when members of the public at large engage in placing bets upon the result of the races, no such conclusion can be drawn. The patrons of the race tracks know little or nothing about either the quality of the horse, or of the jockey. Their choice of a horse to "win," "place" or "show," is at most a guess. Any distribution they may receive is the result of chance. Most such bets are placed as a result of a hunch or some whimsical fancy, and do not result from the application of skill or judgment. The fact that most bets are so placed is a matter of common knowledge. The courts should not close their eyes to facts known to the general public. Furthermore, as stated in petitioners' brief:

"The track makes every effort to grade horses according to their ability to perform and to handicap them to equalize the chances of each horse to win."

This classification of the horses is done by the experts. The result is that the ordinary pari mutuel patron is almost completely without ability to pick a winner, or to

exercise any appreciable skill or judgment in that regard.

What the Missouri court said in State, ex Inf. McKittrick v. Globe-Democrat Pub. Co., 341 Mo. 862, 110 S.W.2d 705, 113 A.L.R. 1104, is apropos here:

"* * * whether chance or skill was the determining factor in the contest must depend upon the capacity of the general public—not experts—to solve the problems presented."

Also, what the New Jersey court said in State v. Lovell, 1877, 39 N.J.L. 458–462:

" 'The physical condition of the horse and his rider, the fastenings of his shoes, the honesty of purpose that actuates his rider and his owner in running him, the state of the weather and the track, and these circumstances in the case of every horse that races against him, are all matters about which the judgment of the outside bettor can avail him no more than the arithmetical calculation of chances can avail the dice thrower.' " Longstreth v. Cook, 215 Ark. 72, 220 S.W.2d 433, at 443.

And by Chief Justice Smith, dissenting in Longstreth v. Cook, 215 Ark. 72, 220 S.W. 2d 433, at 447:

"The overwhelming majority of those who are induced to patronize pari-mutuels make their selections as in a guessing game."

Furthermore the patron who bets against the odds on a long shot in the hope of winning a greater reward, resorts to pure chance. "The lure of the *long shot* is practically irresistible to the average human being.—C. B. Davis." Webster's Third New International Dictionary.

In my opinion the act attempts to authorize a lottery in violation of Art. 3, § 20, of the Constitution.

The writ should be denied.

## ON PETITIONS FOR REHEARING

McFADDEN and SMITH, Justices.

Examination of the respective petitions for rehearing submitted by respondent and amicus curiae reveal that the questions presented have been fully considered by this Court in rendering its initial opinion.

Assuming, but not deciding, that amicus curiae are entitled to submit a petition for rehearing, it again must be pointed out that the legislature having acted on a matter of public policy has seen fit to adopt the present "Idaho Horse Racing Act." Idaho Const. Art. 3, § 20 prohibits the legislature from authorizing "any lottery or gift enterprise". While the wagering authorized by such Act may constitute a form of gambling, nevertheless the Constitution does not pro-

hibit gambling unless it is in fact a lottery or gift enterprise.

Amicus curiae contend, however, that such Act is also in contravention of Idaho Const. Art. 3, § 24. That section of the Constitution is a declaration of policy which admonishes the *legislature* to "further all wise and well directed efforts for the promotion of temperance and morality." The legislature having acted in this area on a matter of public policy, the only question remaining for determination by the Court was whether the Act contravened Idaho Const. Art. 3, § 20, and we continue to adhere to our original opinion, that it does not.

Respondent would have this Court adopt the rule that a determination as to whether a particular scheme of wagering constitutes a lottery, should be based on whether the element of skill predominates over the element of chance. It is our conclusion that the persuasive weight of authority rejects that rationale of decision.

We have by the original opinion concluded that "lottery" as used in our Constitution applies only to distributions of money or things of value by chance, and in which process of distribution the element of skill plays no part. If skill plays any part in determining the distribution there is no lottery as prohibited by our Constitution. In any particular game where skill is in fact an element, the questions of whether skill predominates over chance in determination of the result, and whether any game in which skill may or may not predominate is to be prohibited, must be decided by the legislature under its inherent and delegated powers as the law making body.

Petitions for rehearing are denied.

KNUDSON, C. J., and McQUADE, J., concur.

TAYLOR, J., dissents.