612 P.2d 1186

IDAHO QUARTERHORSE BREEDERS ASSOCIATION, INC., a non-profit corporation, Earl Lilley, Troy Vance, and Delpha Van Komen, Individuals, Plaintiffs-Appellants,

v.

ADA COUNTY FAIR BOARD, a political subdivision of the State of Idaho, aka Western Idaho Fair Board, Harold O. Nelson, Richard Adams, Dr. Art S. Cudmore, William Tate, Clyde Rutledge, William Stevens and Robert DesAulniers, Individually and as members of the Ada County Fair Board, aka Western Idaho Fair Board, Dan Peters, Individually and as General Manager of the Ada County Fair Board, aka Western Idaho Fair Board, Duane Diedrickson, Individually and as racing secretary of the Ada County Fair Board, aka Western Idaho Fair Board, operating under the name and style of Les Bois Park; and John Does I through XX, Individually and as members of the Stall Committee of the Ada County Fair Board, aka Western Idaho Fair Board, operating under the name and style of Les Bois Park, Defendants-Respondents.

No. 12869.

Supreme Court of Idaho.

June 3, 1980.

Rehearing Denied July 22, 1980.

**340**

Wilbur T. Nelson of Nelson & Westberg, Boise, for plaintiffs-appellants.

G. Lance Salladay of Risch, Goss & Insinger, Boise, for defendants-respondents.

SHEPARD, Justice.

This is an appeal from the order of the district court dismissing plaintiffs' cause of action in which they sought relief by declaratory judgment and injunction from certain practices of the defendants in conducting horse racing meets as those practices affect the racing of quarterhorses. We affirm.

In 1963, the Idaho legislature enacted the "Idaho Horse Racing Act." I.C. § 54–2501 to –2516. Therein the legislature indicated its intent to regulate the racing of horses in the State of Idaho when such racing is accompanied by a pari-mutuel system of wagering. I.C. § 54–2502. That legislative scheme of regulation and licensing was held constitutional in *Oneida Fair Board v. Smylie*, 86 Idaho 341, 386 P.2d 374 (1963).

■ We note initially that the legislative scheme of regulation and licensing relates only to the conducting of horse racing when such is accompanied by a pari-mutuel system of wagering. The duties and authority of the Horse Racing Commission, the need for licenses, the conducting of betting and distribution of sums resulting from betting, and the penalties for violations of provisions of the Act are all couched in terms of "race meet." As noted, "race meet" is defined as an exhibition of horse racing "where the pari-mutuel system of wagering is used." Hence, we find no intention of the legislature to license, control or regulate the racing of horses in Idaho except when such racing is accompanied by a system of pari-mutuel wagering.

Defendant-respondent Western Idaho Fair Board owns Les Bois Race Track where it is licensed to and does conduct a horse "race meet." The Fair Board has contracted with the Idaho Thoroughbred Association as to the minimum purses to be paid at thoroughbred races, the minimum number of thoroughbred races at each race meet, the percentage of purses and year-end bonuses to be paid to the Thoroughbred Breeding Association.

I.C. § 54–2513 provides in pertinent part: "(A) Each licensee conducting the pari-mutuel system shall distribute all sums deposited in any pool to the winner thereof, less an amount as prescribed in the following table. * * *

* * * * * *

One half of one per centum (½%) of all gross receipts generated by the mutuel handle shall be distributed by the licensee in proportion to the handle generated by each breed, to lawfully constitute[d] representatives of each breed, to benefit owners and/or breeders of Idaho bred racing thoroughbreds, racing quarter horses, racing Appaloosas, racing paints and racing Arabians, subject to the approval of the commission."

Under this statutory system of distribution, the more races a particular breed of horse runs, the more profit is realized by the representatives of that breed. Monetary gain can also be insured by scheduling certain breeds of horses to run when the betting is most active. According to current practice, quarterhorse races are not scheduled as frequently as thoroughbred races and quarterhorse races are allegedly placed in less favorable locations on the race card.

Plaintiffs-appellants own, breed and race quarterhorses. They allege that the Fair Board and the Racing Secretary, in scheduling fewer quarterhorse races than thoroughbred races and in positioning quarterhorse races on the cards at positions less likely to generate heavy betting, deprive them of property without due process and violate the legislative intent of the Horse Racing Act. They also assert that the discrimination against quarterhorse racing and quarterhorse owners is arbitrary, capricious and violative of the Equal Protection Clause. Plaintiffs-appellants also allege that public funds are illegally used to benefit private individuals and that the contracts between the Fair Board and the Thoroughbred Breeding Association violate the spirit of the Act and infringe on the discretion of the Racing Secretary. Plaintiffs-appellants sought injunctive relief to obtain more quarterhorse races at more favorable times and also sought to have the contracts between the Fair Board and the Thoroughbred Breeding Association declared void as a matter of law.

Defendants-respondents moved for summary judgment on the basis that there were no unresolved issues of material fact and that they were entitled to judgment as a matter of law. The trial court agreed and issued judgment dismissing plaintiffs' cause of action. Summary judgment is granted only "if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c); see *Mitchell v. Siqueiros*, 99 Idaho 396, 582 P.2d 1074 (1978); *State Tax Comm'n v. Western Electric, Inc.*, 99 Idaho 226, 580 P.2d 72 (1978). Here there were no material facts in dispute.

Appellants argue that issues of fact remain to be decided as to whether discrimination existed and, if so, whether the value of plaintiffs' property was affected by this discrimination. The record discloses, however, that for the purposes of the summary judgment motion, defendants-respondents stipulated as to the existence of discrimination and that it affected the value of plaintiffs-appellants' property. Appellants also argue that a "factual" issue remains to be determined as to whether the contract between the Fair Board and the Thoroughbred Breeding Association illegally delegated responsibilities of the Fair Board. We disagree. The existence of the contracts is not in dispute and the trial court determined as a matter of law that such contracts were not illegal. We agree that the general rule is that the legal effect and implication of the contract is a question of law. See *Cassia Creek Reservoir Co. v. Harper*, 91 Idaho 488, 426 P.2d 209 (1967); *West v. Brenner*, 88 Idaho 44, 396 P.2d 115 (1964). Hence, no material issue of fact relating to those contracts remains for resolution.

In disposing of the remaining assertions of plaintiffs-appellants, we merely might set forth the trial court's exhaustive and

well-reasoned memorandum opinion, with which we agree in its entirety. However, for the sake of brevity, we paraphrase it.

■ Plaintiffs-appellants argue that since quarterhorses are only allocated approximately one-third of the number of races on any daily card and since quarterhorse races are placed in positions less likely to generate a large pari-mutuel betting handle, they are deprived of property without due process. They argue that the value of quarterhorses and a quarterhorse owner's racing profits might increase significantly if the breed were allowed to run in more races and at better positions on the daily card. However correct such assertion may be, nevertheless, it does not constitute a protected property right. We hold that these plaintiffs-appellants do not have a cognizable property interest. As stated by the trial court,

> "[t]he 'property' which the plaintiffs claim to be deprived of consists of increased purse money, which their horses *might* win, and the increase in the value of their horses, and an increase in stud fees which their horse *may* produce. Plaintiffs go to some trouble to show that these benefits necessarily flow from increased racing and greater exposure. But it is clear that these benefits are not property to which plaintiffs have any present title or vested rights. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Loebeck v. Board of Education*, 96 Idaho 459, 530 P.2d 1149 (1975)." (Emphasis in original.)

We agree.

■ Plaintiffs-appellants next assert that the stipulated discrimination against quarterhorse owners deprives them of equal protection of the law in violation of the United States and Idaho Constitutions in that favored treatment of thoroughbred owners causes economic loss to quarterhorse owners. Quarterhorse breeders are not a suspect class, the asserted discrimination does not interfere with a fundamental constitutional interest and thus the level of scrutiny is a rational basis. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Here the record indicates that if more quarterhorse races were held at better positions on the daily card, the reasoned judgment of the Les Bois Park officials was that the quality of competing horses and thus the quality of races would drop and the pari-mutuel handle generated would decrease. In turn, there would be a decrease in monies generated for the public schools. We hold such is a sufficient rational basis to sustain the constitutionality of the actions of the officials on the equal protection issue.

■ Plaintiffs-appellants next assert that the practice of scheduling fewer quarterhorse races at less favorable positions on the daily card is violative of the Idaho Horse Racing Act. They assert that the Act indicates a legislative intent to encourage horse breeding in Idaho. *See* I.C. § 54–2510.[1] Plaintiffs-appellants argue that thoroughbred horses are statistically more likely to have been bred out of state and that quarterhorses are more likely to be Idaho bred.

I.C. § 54–2510 is the only portion of the Idaho Horse Racing Act that indicates any intent to encourage Idaho horse breeding. As to the remaining portions of the Act, it is clear, as held by the trial court, that the demonstrated legislative concern is to provide a horse racing system in Idaho which, when coupled with pari-mutuel wagering, is closely supervised and regulated to prevent abuses and illegal activity. We hold that the current practices of the Fair Board in

1. 54–2510. *Race exclusively for Idaho bred horses—Bonus for winner.—*For the purpose of encouraging the breeding, within this state, of valuable thoroughbred, purebred and/or registered horses, at least one (1) race each day at each race meet shall be limited to Idaho bred horses. If in the opinion of the commission sufficient competition cannot be had among such class of horses, said race may be eliminated for said days and a substitute provided instead.

A sum equal to ten per cent (10%) of the first money of every purse won by an Idaho bred horse shall be paid by the licensee conducting the race meet to the breeder of such horse.

scheduling racing events do not offend the legislative intent in the Idaho Horse Racing Act.

 Plaintiffs-appellants next argue that the distribution of public funds to thoroughbred owners in the form of purses and statutory percentages violates Art. XII, § 4 of the Idaho Constitution as benefiting private individuals with public funds. Plaintiffs-appellants do not object to the use of public funds to provide racing facilities for horses, but only object because they, as quarterhorse owners, do not receive a greater portion of the monies. Quarterhorse owners are also private individuals and if the current practice of distributing funds in the form of purses and statutory percentages is void as to thoroughbred breeders and owners, it would likewise be unconstitutional as to quarterhorse owners and breeders. Hence, the remedy sought by the quarterhorse owners would not rectify the alleged unconstitutional usage of public funds and this allegation is without merit.

Plaintiffs-appellants next argue that the contracts between the Fair Board and the Idaho Thoroughbred Breeding Association violate the legislative intent of the Idaho Horse Racing Act and illegally infringe on the discretion of the Racing Secretary. We, as did the trial court, find nothing in the Idaho Horse Racing Act that restricts the right of the Fair Board to enter into contracts. Likewise, we find nothing in the Act that inhibits the right of the Fair Board to contract with the Thoroughbred Racing Association for certain numbers of thoroughbred races. As noted by the trial judge, the contracts, while requiring consultation with the Thoroughbred Breeding Association, ultimately leave the final decisions with the Fair Board.

Plaintiffs-appellants finally argued that the trial court erred in allowing defendants-respondents attorney fees through the retroactive application of I.C. § 12–121. We disagree. *See Jensen v. Shank*, 99 Idaho 565, 585 P.2d 1276 (1978).

The judgment of the trial court is affirmed in all respects. Cost to respondents. No attorney fees allowed.

DONALDSON, C. J., and BAKES, McFADDEN and BISTLINE, JJ., concur.