867 P.2d 911

**NEZ PERCE TRIBE, Petitioner,**

v.

**Pete T. CENARRUSA, Secretary of State, State of Idaho, and Tom Boyd, Robert C. Geddes, Albert M. Johnson, Gary L. Montgomery, Harold W. Reid, James F. Stoicheff, JoAn E. Wood, Michael D. Crapo, Marti Calabretta, Herb Carlson, Patricia L. McDermott, Atwell Parry, Bruce L. Sweeney and Jerry Twiggs, Individually and in their capacity as members of the Idaho Legislative Council, Respondents.**

No. 20281.

Supreme Court of Idaho.

Oct. 5, 1993.

Douglas R. Nash, Lapwai, for petitioner.

Hon. Larry EchoHawk, Atty. Gen., David G. High, Deputy Atty. Gen., Boise, for respondents. David G. High argued.

TROUT, Justice.

This is an original proceeding to determine the constitutionality of an amendment to Article 3, § 20 of the Idaho Constitution. The amendment clarifies Idaho's policy on gambling and specifically prohibits casino gambling within the State. The issue presented by Petitioner's amended petition is whether the legislature violated constitutionally mandated procedures for submitting a proposed amendment to the electorate.

## I.

## BACKGROUND

On July 27, 1992, the Idaho Legislature met in special session to consider a constitutional amendment addressing the issue of gambling in Idaho. The impetus for the special session was concern about the possible development of gambling on Indian reservations in Idaho. The legislature held public hearings and invited interested parties to testify on the proposed amendment, then drafted and passed the amendment as House Joint Resolution No. 4 (H.J.R. 4), to be submitted to the public on the November 3, 1992 ballot.

The measure proposed to amend Article 3, § 20 of the Idaho Constitution to declare that gambling is contrary to public policy and is strictly prohibited. It would exempt from coverage parimutuel betting, charitable bingo and the state lottery; while specifically declaring that casino gambling is not allowed. The amendment would also permit promotional contests and games which award only additional play by stating that these activities are not gambling.

On October 23, 1992, the Nez Perce filed a petition for an extraordinary writ of mandamus to prohibit H.J.R. 4 from being presented on the election ballot. This Court denied the writ without prejudice, and on November 3, 1992, fifty-eight percent of the Idaho electorate voted in favor of H.J.R. 4.

On November 23, 1992, the Nez Perce Tribe submitted an amended petition for extraordinary writ or other relief requesting that the Court find the statement of purpose, and the arguments supporting and opposing H.J.R. 4, prepared by the legislative council violated Article 20, § 1 of the Idaho Constitution and the provisions of House Bill 2 (H.B. 2). The Nez Perce also requested that the Court issue a writ of mandamus directing the Secretary of State to respond to the petition and to invalidate the results of the November 3, 1992 election.

## II.

## JURISDICTION

■ Article 5, § 9 of the Idaho Constitution grants this Court "original jurisdiction to issue writs of mandamus, certiorari, prohibition, and habeas corpus, and all writs necessary or proper to the complete exercise of its appellate jurisdiction." We will accept jurisdiction to review a petition for extraordinary relief where the petition alleges sufficient facts concerning possible constitutional violations. *See Sweeney v. Otter*, 119 Idaho 135, 138, 804 P.2d 308, 311 (1990). Furthermore, in certain circumstances this Court will exercise its original jurisdiction to rule on the constitutionality of a statute. *See Mead v. Arnell*, 117 Idaho 660, 791 P.2d 410 (1990); *see also Evans v. Andrus*, 124 Idaho 6, 855 P.2d 467 (1993).

In *Mead v. Arnell*, the Idaho Board of Health and Welfare requested that the Court issue a writ of mandamus to require District VII to comply with rules issued by the Board and a writ of prohibition to nullify legislative action on a statute. 117 Idaho at 664, 791 P.2d at 414. Under these circumstances, the Court stated "[o]ur disposition of the constitutionality of [the statute] will be limited to a simple declaration of its constitutionality or lack thereof." *Id.*

■ In the present case, the Nez Perce have submitted an amended petition for an extraordinary writ or other relief. In their amended petition, the Nez Perce specifically ask the Court to find H.J.R. 4 invalid because it violates the Idaho Constitution. The Nez Perce also ask the Court to issue a writ

of mandamus directing the Secretary of State to "invalidate" H.J.R. 4 and announce to the public that there has been no constitutional amendment to Article 3, § 20. In their reply brief, the Nez Perce also request that the Court order the Secretary of State not to enroll the amendment in the public records under I.C. § 67–508. Although we question the the propriety of a writ of mandamus directed at the Secretary of State to invalidate a constitutional amendment, we, nevertheless, exercise our original jurisdiction because the amended petition of the Nez Perce alleges sufficient facts concerning possible constitutional violations. *See Sweeney v. Otter*, 119 Idaho at 138, 804 P.2d at 311. We limit our decision to a determination of the constitutionality of the methods and procedures utilized in the passage of H.J.R. 4. *See Mead v. Arnell*, 117 Idaho at 664, 791 P.2d at 414.

## III.

### THE STATEMENT OF MEANING AND PURPOSE MEETS STATUTORY AND CONSTITUTIONAL REQUIREMENTS

In submitting this amendment for public approval, the legislature was required to follow the procedures set forth in House Bill 2 [1] and Article 20, § 1 of the Idaho Constitution. Idaho Code § 67–453 and H.B. 2 require the legislative council to draft a statement of meaning and purpose which is to be published next to the amendment on the ballot and publish arguments for and against the amendment. Article 20, § 1 further requires that proposed amendments to the Constitution be passed by two-thirds of both houses of the legislature and submitted to the electors for approval.

The Nez Perce argue that the statement of meaning and purpose for H.J.R. 4 violated Article 20, § 1 of the Idaho Constitution and

the provisions of H.B. 2 because it did not mention Indian gaming. We disagree.

The Court has said that "the only method of submitting a public question to the individual voter is by proper ballot advising him directly or by general reference to the actual issue to be determined." *Lane v. Lukens*, 48 Idaho 517, 523, 283 P. 532, 533 (1929). We differ from the Nez Perce in our definition of the "actual issue to be determined" by the proposed amendment.

H.J.R. 4 provides:

That Section 20, Article III, of the Constitution of the State of Idaho be amended to read a[s] follows:

SECTION 20. GAMBLING ~~NOT TO BE AUTHORIZED~~ PROHIBITED. (1) ~~No game of chance, lottery, gift enterprise or gambling shall be authorized under any pretense or for any purpose whatever,~~ Gambling is contrary to public policy and is strictly prohibited except for the following:

a. A state lottery which is authorized by the state if conducted in conformity with ~~law~~ enabling legislation; and

b. Pari-mutuel betting if conducted in conformity with ~~law~~ enabling legislation; and

c. ~~Charitable~~ Bingo and raffle games ~~of chance which~~ that are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with ~~law~~ enabling legislation.

(2) No activities permitted by subsection (1) shall employ any form of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat, keno and slot machines, or employ any electronic or electromechanical imitation or simulation of any form of casino gambling.

---

1. The legislature passed H.B.2, which amended the time limitations in I.C. § 67–453 to allow the amendment to be submitted to the public on the November 3, 1992 ballot. The substantive provisions in H.B.2 are identical to those in I.C. § 67–453 and provide in part as follows:

    [T]he legislative council shall, not later than August 14, 1992, prepare and file with the secretary of state a dossier containing the following:

    (1) a brief statement setting forth in simple, understandable language the meaning and purpose of the proposed amendment and the result to be accomplished by such amendment. The statement shall be included in the publications of the proposed amendment required by law of the secretary of state, and shall be printed on the official ballot by which such proposed amendment is submitted to the electors: ....

40

(3) The legislature shall provide by law penalties for violations of this section.

(4) Notwithstanding the foregoing, the following are not gambling and are not prohibited by this section:

a. Merchant promotional contests and drawings conducted incidentally to bona fide nongaming business operations, if prizes are awarded without consideration being charged to participants; and

b. Games that award only additional play.

The question to be submitted to the electors of the State of Idaho at the next general election shall be a[s] follows:

"Shall Section 20, Article III, of the Constitution of the State of Idaho be amended:

(1) To clarify that gambling is contrary to public policy and is strictly prohibited except for a state lottery which is authorized by the state of Idaho, pari-mutuel betting, and bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes if the lottery, pari-mutuel betting, and charitable bingo or raffle games are conducted in conformity with enabling legislation;

(2) To prohibit the employment of any game that is typical of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat, keno and slot machines, and to prohibit the employment of any electronic or electromechanical imitation or simulation of any form of casino gambling;

(3) To provide that the legislature shall provide by law penalties for violations of this constitutional amendment; and

(4) To provide that: (i) merchant promotional contests and drawings conducted incidentally to bona fide nongaming business operations if prizes are awarded without consideration being charged to participants; and (ii) games that award only additional play are not gambling and shall not be prohibited by this constitutional amendment?".

The statement of meaning and purpose prepared by the legislative council for H.J.R. 4 reads:

**Meaning and Purpose**

The purpose of the proposed amendment to Section 20, Article III of the Constitution of the State of Idaho is to clarify state policy on gambling. The amendment specifically prohibits casino gambling and limits authorized gaming to the state lottery, pari-mutuel betting and bingo and raffle games conducted by qualified charitable organizations for charitable purposes. The amendment imposes the further limitation that even though authorized under the constitution, such gaming may be conducted only in conformity with enabling legislation. A final provision clarifies that the gaming prohibition does not include games that award only additional play and merchant promotional contests and drawings which award prizes with no charge to participants if conducted incidentally to bona fide nongaming business operations.

**Effect of Adoption**

The amendment would clarify Idaho's policy against casino gambling. This proposed constitutional amendment continues to allow the state lottery and pari-mutuel betting and would limit charitable gaming to bingo and raffle games. The lottery and pari-mutuel betting are presently operating under statutory authority and would continue in effect whether or not the amendment is approved. If the amendment is approved, charitable bingo and raffle games would be temporarily authorized pursuant to legislation enacted during the July 1992, extraordinary session of the legislature. Permanent authorization would require further action by the legislature.

■ The Nez Perce assert that the true purpose of H.J.R. 4 was to prohibit Indian gaming, and that this purpose should have been stated in the statement of meaning and purpose. While we agree that the primary motivation for the legislature's action was the fear of gambling on Indian reservations, the actual scope of H.J.R. 4 is far broader than

the issue of Indian gaming. H.J.R. 4 sets forth constitutional policy for all types of gambling throughout the state of Idaho. This admittedly includes Indian gaming, but that was not the sole issue to be determined by the voters. For this reason, the statement of purpose and meaning prepared by the legislative council is directly consistent with the plain language of the amendment and is in no way misleading or deceptive.

The statement declares that the amendment will clarify Idaho's policy on gambling and will specifically prohibit casino gambling. This is the purpose and effect of the amendment. The statement makes it known to the voters that they are setting gambling policy for Idaho. It declares that the amendment will prohibit casino gambling in Idaho, and details specific examples of such gambling. The statement of meaning and purpose is not untrue or misleading just because it does not mention that gambling conducted on Indian reservations in the state of Idaho is included in the prohibition. The statement makes clear that all casino gambling, Indian or otherwise, is prohibited. Accordingly, to the extent that Indian reservations are governed by the laws of the state of Idaho, they would be subject to the provisions of the gambling amendment.

■ The statement of meaning and purpose need not specify every possible reason for or effect of an amendment; it need only set forth the general purpose to be accomplished by the amendment. The statement of purpose and meaning of H.J.R. 4 is consistent with the actual effect of the amendment; H.J.R. 4 does not accomplish anything more than that which is declared in the statement of purpose. This is not a situation where the voters approved a measure which may have broader reaching and unexpected consequences. Here the consequences, a prohibi-

tion of gambling in Idaho, were clearly explained. The fact that one aspect of gambling in Idaho was not specifically named does not mean the voters have been misled. Thus, the statement of purpose and meaning of H.J.R. 4 meets the requirements of Article 20, § 1.

## IV.

## THE ARGUMENTS IN FAVOR OF THE PROPOSED AMENDMENT FAIRLY REPRESENTED THE POSITION OF THE PROPONENTS

■ H.B. 2 also required the legislative council to prepare and publish arguments advanced by the proponents and opponents of the amendment.[2] The arguments must be designed "to represent as fairly as possible the arguments relative to the proposed amendment." The Nez Perce contend that the published argument of the proponents stated incorrect facts pertaining to Idaho's historical policy on gambling.

The first two sentences in the "Statements For the Proposed Amendment" are: "The amendment will confirm Idaho's long-standing policy against casino gambling. This constitutional policy has existed since statehood." These statements are consistent with the Court's historical interpretation of Article 3, § 20 of the Idaho Constitution.

From the original adoption of the Idaho Constitution until 1988, Article 3, § 20 stated only that the legislature "shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever." The Nez Perce are correct in their assertion that this provision did not prohibit all types of gambling. *See Oneida County Fair Bd. v. Smylie*, 86 Idaho 341, 345, 386 P.2d 374, 376 (1963). In *Oneida*, the Court held that pari-

---

2. [T]he legislative council shall, not later than August 14, 1992, prepare:

. . . .

(2) a concise presentation of the major arguments advanced by the proponents and opponents of the proposed amendment designed to represent as fairly as possible the arguments relative to the proposed amendment. In preparing such arguments, the legislative council may seek the advice and suggestions of known supporters and opponents or any other persons or groups and may, in its sole discretion, use any of the suggested arguments. If any such suggestions are utilized by the legislative council, no recognition shall be given to the persons or groups which submitted the argument. The arguments shall be published in the publications required by law of the secretary of state, but shall not appear on the ballot by which such proposed amendment is submitted to the electors.

H.B. 2; I.C. § 67–453.

mutuel betting was not contrary to the constitutional prohibition on lotteries because parimutuel wagering depends, to some extent, on the skill of the gambler and is not solely based on chance. *Id.* at 368, 386 P.2d at 391.

However, the proponent's argument for H.J.R. 4 does not state that there was a long-standing policy against all gambling, only "casino gambling." In *State v. Village of Garden City*, 74 Idaho 513, 265 P.2d 328 (1953), the Court found that the constitutional prohibition against "lotteries" included all games of pure chance. The Court held that "all lotteries are gambling" and include slot machines, punch boards and all other such games "that the ingenuity of man might thereafter invent." *Id.* Under *Oneida* and *Garden City*, lotteries or games of pure chance were prohibited under the original Idaho Constitution.

Although "casino gambling" is not defined, logically, it refers to the types of gambling provided in a casino. H.J.R. 4 specifically lists examples of casino gambling as: "blackjack, craps, roulette, poker, bacarrat, keno and slot machines." In general, these types of games involve pure chance as defined by *Village of Garden City*, 74 Idaho at 519, 265 P.2d at 329. As such was the case with lotteries, these games have been prohibited since statehood under Idaho's original constitution. For this reason, it was a fair interpretation of the proponents' arguments in favor of H.J.R. 4 to state that Idaho had a longstanding constitutional policy against casino gambling.

## V.

### H.J.R. 4 WAS PROPERLY PRESENTED TO THE ELECTORATE AS ONE AMENDMENT

■ Article 20, § 2 of the Idaho Constitution states: "If two (2) or more amendments are proposed, they shall be submitted in such a manner that the electors shall vote for or against each of them separately." In the case at bar, the Nez Perce argue that the amendment contains multiple subject matters which should have been presented to the public separately. They contend that the amendment contains: (1) a prohibition on casino gambling; (2) a requirement of enabling legislation; and (3) exceptions to the prohibition.

In *McBee v. Brady*, 15 Idaho 761, 100 P. 97 (1909), the Court stated that the test to determine if there are separate subjects is whether the proposal can be divided into "distinct and independent" subjects any one of which can be "adopted without in any way being controlled, modified or qualified by the other[.]" *Id.* at 779, 100 P. at 103. The Court also indicated that the intent of Article 20, § 2 was to require that incongruous or unrelated subjects be considered as separate amendments. *Id.* The Court has rephrased the test in *McBee* over the years stating that the issue is not merely whether the matters in an amendment can be divided into separate questions, but whether the matters are "incongruous and essentially unrelated." *Idaho Water Resources Bd. v. Kramer*, 97 Idaho 535, 552, 548 P.2d 35, 52 (1976) *citing Keenan v. Price*, 68 Idaho 423, 454, 195 P.2d 662, 681 (1948).

In *Idaho Water Resources*, the Court reiterated the test from *Mundell v. Swedlund*, 58 Idaho 209, 224, 71 P.2d 434, 441 (1937):

[I]f a proposed amendment, when divided up into two or more amendments, reduces the questions to such form that the voters might reject the main or controlling question and adopt the collateral or subordinate amendment or amendments, and thus leave the amendment or amendments so adopted useless and inoperative, or so incongruous as to upset or impair an existing system, then the whole matter should be submitted as one amendment.

*Idaho Water Resources*, 97 Idaho at 551, 548 P.2d at 51.

In the present case, the amendment prohibits gambling generally, allows exceptions if authorized by statute, and states other specific prohibitions and exceptions. It would make little sense to separate these provisions. If the provisions of H.J.R. 4 were considered separately, the voters could reject the main proposition, the prohibition on gambling, rendering the exceptions to the prohibition and the provisions for enabling

legislation meaningless. Although the provisions may be separable, they do not appear to be "incongruous and essentially unrelated." Accordingly, we find that H.J.R. 4 was appropriately submitted to the electorate as a single amendment.

## VI.

### CONCLUSION

We find that H.J.R. 4 was properly presented for voter approval on the November 3, 1992 election ballot. Accordingly, the constitutional amendment to Article 3, § 20 was validly approved by the Idaho electorate.

McDEVITT, C.J., and SILAK, J., concur.

JOHNSON, Justice, concurring and dissenting.

I concur in parts I (Background), II (Jurisdiction), and V (H.J.R. 4 Was Properly Presented to the Electorate as One Amendment). I respectfully dissent from parts III (The Statement of Meaning and Purpose Meets Statutory and Constitutional Requirements), IV (The Arguments in Favor of the Proposed Amendment Fairly Represented the Position of the Proponents), and VI (Conclusion).

## THE STATEMENT OF MEANING AND PURPOSE DOES NOT MEET STATUTORY AND CONSTITUTIONAL REQUIREMENTS.

One of the primary purposes of H.J.R. 4 was to prevent casino gambling on Indian reservations. Deputy attorney general High explained this purpose of the proposed amendment to the Legislative Council on June 25, 1992:

> The Indian Gaming Regulatory Act was passed by Congress to define the limits of gaming on Indian lands. As you probably know, the Indian Tribes are sovereigns; they are regulated by federal law and to the extent federal law regulates them, that's the rule. Idaho doesn't per se regulate on reservations.
>
> . . . .
>
> And when it comes to matters and nature of public policy such as gaming, Congress

did not want to leave the states out of the process and ended up defining a system of regulation involving three classes of gaming. Class 1 gaming were your traditional tribal games that would be played by Indians in several ways or whatever, and those Congress left exclusively to the tribes to deal with. They put in a Class 2 of gaming, which probably the most significant game in that is bingo. As to that, the Congress essentially left—the legislative history suggested they thought there were 45 states where there was some form of bingo and therefore the Indians would be allowed to engage in bingo. It also had some other games which could be operated if the state allowed certain gaming, such as poker.

Then there was a third class of gaming which is, I guess, is considered a higher level of gaming which does include lotteries and includes pari-mutuel racing and includes all of your additional casino-type games. As to this Class 3 type of gaming, Congress provided that such gaming would not be permitted in any state unless there was a compact negotiated between the state and the tribe to regulate this gaming. I think Congress felt that in this area of Class 3 gaming is where really the state interests were involved and state expertise and regulation would be involved, and they felt that the state and the tribe should negotiate in good faith toward an agreement as to what kind of Class 3 gaming should be permitted in the state and how it should be regulated. The Congress clearly acknowledged that the state had an important policy interest in this area by doing that.

. . . .

I should say that there is a difference in opinion, I think, between our interpretation and what I understand is the tribes' interpretation of what the effect of that provision that gaming, Class 3 gaming, is what is located in the state that permits such gaming for any purpose by any person. I think the tribes had some understanding—to understand that provision to allow the tribes to conduct all Class 3

games if the state allows any Class 3 gaming.

The other interpretation we believe is correct is that the tribes are entitled to conduct all games which the state lets anyone conduct and not subject to the same regulation. And we also think that if the state policy is open enough to allow sufficient gaming, that the whole scheme of the state would be viewed as merely regulatory, that it may be that all games would be open to the tribes.

Okay, so then how does this federal act interplay with where we are with our Idaho Constitution. We have a Constitution which allows the state lottery, which we are not too sure how broad that permits, and charitable games of chance, we're not too sure how broad that permits, and we have a federal act that allows the tribes to conduct any games which the state would let anyone conduct. I think that the—The real question in our mind is what is the state policy? We have always understood it to be that Idaho has a tradition of opposing casino types of gaming. It has allowed a limited amount of gaming that—in the public's mind maybe is perceived as a more innocent form—buying some lottery tickets or going to the race track occasionally—charitable fund raisers.

Minutes of Legislative Council, June 25, 1992, 2–5.

The Court's opinion goes awry when it concludes:

> The statement of meaning and purpose is not untrue or misleading just because it does not mention that gambling conducted on Indian reservations in the state of Idaho is included in the prohibition. The statement makes it clear that all casino gambling, Indian or otherwise, is prohibited. Accordingly, to the extent that Indian reservations are governed by the laws of the state of Idaho, they would be subject to the provision of the gambling amendment.

at 41, 867 P.2d at 915. This is clearly incorrect. Indian reservations are not governed by the gambling laws of Idaho.

Our state constitution acknowledges that "Indian lands shall remain under the abso-

lute jurisdiction and control of the congress of the United States." Id. Const. art. 21, § 19. As the Court said in *State v. McCormack*, 117 Idaho 1009, 1011, 793 P.2d 682, 684 (1990): "Indian tribal members are generally under the exclusive jurisdiction of the United States Government; ...." The only exceptions are those matters over which jurisdiction is assumed and accepted by the state, pursuant to Public Law 280, in I.C. § 67–5101, or as to which the governing body of the tribe has consented pursuant to I.C. § 67–5102. I.C. § 67–5101 does not refer to gambling laws, nor is there any evidence that the governing bodies of any Indian tribe in the state has consented to the state's jurisdiction over gambling on the reservations.

The very purpose of the Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*), to which deputy attorney general High referred in his comments quoted above, was to provide a means of regulating Indian gaming by federal law. It is federal law, and not state law, that governs gambling on Indian reservations. In the Indian Gaming Regulatory Act, Congress stated:

> Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

25 U.S.C. § 2701(5).

This does not provide that state law governs gaming on Indian reservations, but merely leaves to federal determination whether state "criminal law and public policy, prohibit such gaming activity."

What the voters of Idaho were not told in the statement of meaning and purpose for H.J.R. 4 was that one of the primary purposes of the amendment proposed was to prohibit casino gambling on Indian reservations. This was not merely an incidental effect of the amendment as the Court's opinion suggests. It was one of the motivating reasons for H.J.R. 4. The voters should have been told this in the statement of meaning and purpose so that they could been advised of "the actual issue to be deter-

mined." *Lane v. Lukens,* 48 Idaho 517, 523, 283 P. 532, 533 (1929). In my view, the sleight of hand performed by the statement of meaning and purpose was not permissible under I.C. § 67–453 or the special version of this statute enacted in H.B. 2 of the 1992 special session of the Idaho legislature.

## THE ARGUMENTS IN FAVOR OF THE PROPOSED AMENDMENT DID NOT FAIRLY REPRESENT THE POSITION OF THE PROPONENTS.

The Court's opinion concludes that the "Statements for the Proposed Amendment" were consistent with the Court's historical interpretation of Art. 3, § 20 of the Idaho Constitution. I respectfully disagree.

The statements at issue are: "The amendment will confirm Idaho's long-standing policy against casino gambling. This constitutional policy has existed since statehood." The Court's opinion equates "casino gambling" with "lotteries" as defined by the Court in *State v. Village of Garden City,* 74 Idaho 513, 265 P.2d 328 (1953). Nowhere in *Village of Garden City* is "casino gambling" mentioned. The Court instead said:

> All lotteries are gambling. To constitute a lottery, as distinguished from other methods or forms of gambling, it is generally held there are three essential elements, namely, chance, consideration and prize.

*Id.* at 520, 265 P.2d at 330–31.

To say that Idaho has a long-standing constitutional policy against casino gambling is simply not borne out by a reading of *Village of Garden City.*

Likewise, *Oneida County Fair Bd. v. Smylie,* 86 Idaho 341, 386 P.2d 374 (1963) does not support the existence of a long-standing constitutional policy against casino gambling. In *Oneida,* the Court pointed out that the proceedings of our Constitutional Convention "prove conclusively that the framers of our Constitution distinguished a 'lottery' from a 'game of chance.'" *Id.* at 347, 386 P.2d at 337. The Court carefully drew "the historical distinction between 'lottery' and 'game of chance'" and concluded that pari-mutuel wagering on horse racing was not a lottery and

was, therefore, not unconstitutional under Art. 3, § 20 of the Idaho Constitution.

Based on *Village of Garden City* and *Oneida,* the statement might have been made that Idaho had a long-standing constitutional policy against lotteries. There is no basis for a statement that Idaho had a long-standing constitutional policy against casino gambling.

I would conclude that H.J.R. 4 was not properly presented for voter approval and that the amendment to Art. 3, § 20 was not validly approved.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting, and concurring in Justice JOHNSON'S opinion.

The majority holds that H.J.R. 4 was properly presented to Idaho voters in November 1992, and that it is therefore a valid constitutional amendment. Being unable to agree with this assessment, I respectfully dissent.

It is axiomatic that constitutional amendments should receive a higher level of scrutiny than ordinary legislation. Amendments are intended to be more permanent, and our constitution is the foundation of all government activity—it is fundamental. Yet, here, the majority outright admits that the primary motivation of the constitutional amendment was to prevent the development of gaming enterprises on Indian reservations, but nevertheless affirms the validity of H.J.R. 4, the text of which contains no mention of this purpose or its intended effect.

A better and more enlightened view is that the Secretary of State's choice of words in drafting H.J.R. 4 is, at best, disingenuous and under-inclusive, and at worst (perish the thought), deliberately misleading and intentionally oblique. However, regardless of what may be the State's motive, it must at the very least comply with the letter of the law. The Idaho Constitution is clear relative to the requirements of the drafting of amendments. The State did not comply with these requirements, and thus the amendment to Art. 3, § 20 should be found unconstitutional.

As the majority states in its opinion, for each proposed constitutional amendment the

legislative council is required by Art. 20, § 1, and I.C. § 67–453 to prepare for the Secretary of State:

> (1) a brief statement setting forth in simple, understandable language the *meaning* and *purpose* of the proposed amendment and the result to be accomplished by such amendment. The statement shall be included in the publications of the proposed amendment required by law of the secretary of state, and shall be printed on the official ballot by which such proposed amendment is submitted to the electors; ... (emphasis added).

The statement of meaning and purpose for H.J.R. 4 does not state that affecting gaming on Indian reservations is even one of the purposes of this amendment, much less *the* purpose. Regardless of how this amendment is phrased, its undisputed purpose was the prevention of reservation gaming. The amendment thus violates this constitutional directive. Because the statement of purpose omits any mention of the true purpose, and because the amendment itself fails to address its effect on Indian gaming, I find the amendment constitutionally unacceptable.

The majority states that "the actual issue to be determined" by the voters was phrased in a way that was not misleading or deceptive. The majority admits that Indian gaming is one of the issues but forgives its absence from the language of the amendment. The obvious, acknowledged, undisputed purpose of this law appears to have been to prevent Indian casino-style gaming. Yet, even though the constitution requires a drafted statement of the law's meaning and *purpose*, the Court today will unfortunately be seen as giving an approving nod to a description which fails to acknowledge the law's true purpose.

The majority states that "[t]he statement makes it clear that all casino gambling, Indian or otherwise, is prohibited." Where the statement does not mention casino gambling on Indian reservations it is not apparent how it nevertheless "makes it clear" that such gambling is prohibited. Few citizens are fully cognizant of the legal nuances of state versus tribal jurisdiction, but it is common knowledge that special rules apply to Indian reservations and that tribal members are exempt from most state laws and state taxes.

The inhabitants of Indian reservations are among the poorest people in this nation. In other states around the country, through the development of gaming enterprises, tribes have been able to stimulate their economies, improve their schools, health care, and other services, and most importantly affirm their right and their ability to be self-determinating. Thus, a constitutional amendment impacting Idaho's tribes should at the very least have been carefully presented in conformity with the requirements of H.J.R. 4 before it is allowed to restrict their long-established rights as sovereign nations. I therefore agree with Justice Johnson that H.J.R. 4 was not properly presented.