982 P.2d 358

In The Matter of the Verified Petition
for Writ of Prohibition.

IDAHO WATERSHEDS PROJECT and
Jon MARVEL, Petitioners,

v.

STATE BOARD OF LAND COMMIS-
SIONERS, comprised of Phil Batt, Gov-
ernor, Pete T. Cenarrusa, Secretary of
State, Alan G. Lance, Attorney General,
J.D. Williams, State Controller, and
Anne C. Fox, Superintendent of Public
Instruction, all in their official capaci-
ties; Lydia Justice Edwards, Treasurer,
State of Idaho, in her official capacity;
the Investment Board, an agency or in-
strumentality of the State of Idaho; and
Idaho Department of Lands, an agency
of the State of Idaho, Respondents.

No. 25125.

Supreme Court of Idaho,
Boise, December 1998 Term.

April 2, 1999.

Rehearing Denied Aug. 3, 1999.

Laurence (Laird) J. Lucas, Boise, for peti-
tioners.

Hon. Alan G. Lance, Attorney General;
David G. High, Deputy Attorney General,
Boise, for respondent. David G. High ar-
gued.

Before SILAK, Justice, SCHROEDER,
Justice, WALTERS, Justice, JOHNSON,
Justice Pro Tem, and BURDICK, Justice
Pro Tem.

PER CURIAM.

This is an original proceeding challenging
the constitutionality of House Joint Resolu-
tion No. 6 (H.J.R.6) which proposed amend-
ments to Article 9, § 4 and § 8 of the Idaho
Constitution.

## I.

## FACTS AND PROCEDURAL BACKGROUND

The Idaho Watersheds Project (IWP) is a nonprofit organization which states that its purpose is improving the financial returns and ecological conditions on school endowment lands. Since 1993, IWP has submitted applications to the State Land Board and Department of Lands for leases on state endowment lands,[1] and IWP has sought to compete at auction over contested leases. The efforts of IWP have led to several appeals before this Court which involve the "public auction" provision in Article 9, § 8 of the Idaho Constitution.

In 1993, IWP submitted an application to lease endowment lands and won at auction when the prior lessee refused to bid. The Land Board, however, awarded the lease to the prior lessee. On appeal, this Court held that the Land Board "does not have the discretion to grant a lease to an applicant who does not place a bid at an auction, based upon Idaho's constitutional and statutory mandate that the Board conduct an auction." *Idaho Watersheds Project v. State Bd. of Land Comm'rs*, 128 Idaho 761, 766, 918 P.2d 1206, 1211 (1996) (*IWP I*). In 1994, IWP again submitted lease applications, won several of the auctions against prior lessees, and again the Board refused to award any lease to IWP on various grounds.

In 1995, the Idaho Legislature enacted section 58–310B of the Idaho Code which authorizes the Land Board to avoid holding auctions over competing lease applications if it determines that an applicant is not "qualified" to go to auction. The purpose of the enactment is to "encourag[e] a healthy Idaho livestock industry." I.C. § 58–310B(2)(a) (1995); *see also* I.C. §§ 58–310B(4) and 58–301B(6). In June 1995, IWP submitted sixteen new lease applications, all but two of which were denied. IWP appealed, arguing that the Land Board is required to conduct public auctions pursuant to Article 9, § 8. *See* 133 Idaho 68, 982 P.2d 371 (1999). In 1996, IWP again submitted applications for leases

on state endowment lands, and again the Land Board refused to hold auctions over most of them pursuant to I.C. § 58–310B. IWP again appealed. *See* 133 Idaho 64, 982 P.2d 367 (1999).

House Joint Resolution (H.J.R.) 6 was adopted by the Idaho Legislature in 1998. H.J.R. 6 proposes to amend two separate sections of Article 9 of the Idaho Constitution. Section 1 of H.J.R. 6 proposes several amendments to Article 9, § 4, which may be summarized as follows:

1. Change the name of the "Public School Endowment Fund" to the "Public School Permanent Endowment Fund";

2. Provide that proceeds from the sale of public school endowment lands and amounts allocated from the Public School Earnings Fund be included in the Public School Permanent Endowment Fund;

3. Create a new "Land Bank Fund"; and

4. Provide for deposit into the Land Bank Fund proceeds from the sale of endowment lands, to be used within a period of time set by the legislature to acquire other lands for the benefit of endowment beneficiaries.

Section 2 of H.J.R. 6 proposed to amend Article 9, § 8 of the Idaho Constitution. This section of H.J.R. 6 proposed to delete the word "disposal" and replace it with the word "sale" so that the relevant phrase would read: "the general grants of land made by congress to the state shall be . . . subject to *sale* at public auction."

Section 3 of H.J.R. 6 specifies that the following "ballot question" be presented to the electorate:

"Shall Section 4, Article 9, and Section 8, Article 9, of the Constitution of the State of Idaho be amended as follows:

1. To change the name of the Public School Fund to the Public School Permanent Endowment Fund;

2. To provide that the Public School Permanent Endowment Fund shall include proceeds from the sale of school lands and

---

1. Idaho endowment lands are lands endowed in trust to the State of Idaho by the federal government upon admission into the Union for the benefit of public schools.

amounts allocated from the Public School Earnings Reserve Fund;

3. To provide an exception that proceeds from the sale of school lands may be deposited into a Land Bank Fund to be used to acquire other lands within the state for the benefit of endowment beneficiaries, but if those proceeds are not used to acquire other lands within a time provided by the legislature the proceeds of the sale shall be deposited into the Public School Permanent Endowment Fund along with earnings on the proceeds; and

4. To change the word disposal to sale in reference to the disposition of certain lands?".

Section 4 of H.J.R. 6 directs the Legislative Council "to prepare the statements required by Section 67–453, Idaho Code, and file the same." Section 5 directs the Secretary of State to "publish this proposed constitutional amendment and arguments as required by law." While the Secretary of State did publish the "ballot question" set forth in Section 3 of H.J.R. 6, the Legislative Council's Statements of Meaning and Purpose, and statements for and against the proposed amendments, the actual text of the proposed amendments to Article 9, §§ 4 and 8, as contained in H.J.R. 6, was never published prior to the submission of H.J.R. 6 to the electorate.[2]

H.J.R. 6 was approved by the voters on November 3, 1998. On November 18, 1998, IWP and John Marvel filed a petition for writ of prohibition barring the implementation of H.J.R. 6 based on claims that H.J.R. 6 was illegally presented to the electorate. The petition for writ of prohibition was argued on an expedited basis on December 16, 1998.

## II.

## JURISDICTION

█ This Court has original jurisdiction, pursuant to Article 5, § 9 of the Idaho Constitution, "to issue writs of mandamus, certiorari, prohibition, and habeas corpus, and all writs necessary or proper to the complete

exercise of its appellate jurisdiction." Idaho Const. art. V, § 9. We will exercise jurisdiction to review a petition for extraordinary relief where the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature. *See Nez Perce Tribe v. Cenarrusa,* 125 Idaho 37, 38, 867 P.2d 911, 912 (1993) (citing *Sweeney v. Otter,* 119 Idaho 135, 138, 804 P.2d 308, 311 (1990)); *see also Balderston v. Brady,* 17 Idaho 567, 107 P. 493 (1910). In reviewing the constitutionality of H.J.R. 6, we limit our review to a determination of the constitutionality of the methods and procedures utilized in the passage of H.J.R. 6. *See Mead v. Arnell,* 117 Idaho 660, 664, 791 P.2d 410, 414 (1990).

## III.

## ISSUES ON APPEAL

Petitioners submit the following issues in support of the petition for writ of prohibition:

1. Whether H.J.R. 6 violated Article 20, § 1 of the Idaho Constitution and I.C. § 67–913 in that the actual text of the proposed amendments was never published.

2. Whether H.J.R. 6 violates Article 20, § 1 of the Idaho Constitution, I.C. § 67–453, and/or the state and federal due process guarantees as a result of allegedly misleading statements and explanations that were presented to the electorate for consideration of the ballot measure.

3. Whether H.J.R. 6 unconstitutionally violates Article 20, § 2 of the Idaho Constitution.

## IV.

## ANALYSIS

A. **Because The Alleged Procedural Defects Were Not Misleading, The Statutory And Constitutional Challenges To These Procedures Are Time Barred Because They Were Not Presented Before The Election.**

In presenting H.J.R. 6 to the electorate for public approval, the legislature was required to follow the procedures set forth in Article

---

**2.** *See* Appendix 1.

20 of the Idaho Constitution and sections 67–913 and 67–453 of the Idaho Code. Petitioners argue that H.J.R. 6 should be declared invalid for failing to comply with procedural requirements of Article 20, § 1 and I.C. §§ 67–453 and 67–913.

Specifically, Petitioners argue that the actual text of the proposed amendments must be published according to Article 20, § 1 and I.C. § 67–913. Article 20, § 1 requires that proposed amendments to the Constitution be passed by two-thirds of both houses of the legislature and submitted to the electors for approval. Article 20, § 1 further requires that the legislature publish the proposed amendments and the arguments proposing and opposing said amendments. Section 67–913 of the Idaho Code requires the Secretary of State to "provide for the publication of the statement of meaning and purpose ... as well as the text of the proposed amendment." I.C. § 67–913. IWP argues that its members and the general public were deprived of a fair opportunity to understand and vote on amendments proposed in H.J.R. 6 because the actual language of the proposed amendments was never published as required.

Petitioners further contend that the ballot measure is invalid because the Statements of Meaning and Purpose and statements for and against H.J.R. 6 are misleading in violation of Article 20, § 1 and I.C. § 67–453 as well as constitutional due process guarantees. Section § 67–453 of the Idaho Code requires that the legislature prepare and file with the Secretary of State:

a brief statement setting forth in simple, understandable language the meaning and purpose of the proposed amendment and the result to be accomplished by such amendment[,] ... and a concise presentation of the major arguments advanced by the proponents and opponents of the proposed amendment designed to represent as fairly as possible the arguments relative to the proposed amendment.

I.C. § 67–453. Petitioners argue that the ballot question and materials as presented did not provide, as required by law, a simple and understandable statement of the meaning and purpose of H.J.R. 6, and of the effect of the proposed amendments. They further argue that the proposals were confusing and that the ballot materials did not provide a fair representation of possible arguments relating to the proposed amendments. Petitioners also contend that the ballot materials as presented contained false and inaccurate assertions which failed to properly inform voters as to the true nature of the amendments.

Unlike initiatives, for which there is a statutory procedure for post-election challenge, the standard for reviewing a ballot measure for a constitutional amendment after an election was set forth by this Court in *Penrod v. Crowley*, 82 Idaho 511, 356 P.2d 73 (1960):

[T]his court has recognized the almost universal rule that once an amendment is duly proposed and is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before them, the effect of a favorable vote by the people is to cure defects in the form of the submission.

*Id.* at 525, 356 P.2d at 82. This Court in *Haile v. Foote*, 90 Idaho 261, 409 P.2d 409 (1965), reaffirmed the principle that "[t]he will of the electors as indicated by their ballots should not be defeated by a mere irregularity in the procedure of submission of the amendment." *Id.* at 271, 409 P.2d at 415 (quoting *Penrod*, 82 Idaho at 526, 356 P.2d at 83).

It is noteworthy that Petitioners did not challenge the publication methods utilized in providing public notice of the purpose, content, and effect of H.J.R. 6 until after the election. Petitioners cite *Associated Taxpayers of Idaho v. Cenarrusa*, 111 Idaho 502, 725 P.2d 526 (1986), and *Nez Perce Tribe v. Cenarrusa*, 125 Idaho 37, 867 P.2d 911 (1993), for the proposition that Petitioners could not have brought a pre-election challenge to the validity of H.J.R. 6 until the measure was adopted at the election. However, in *Associated Taxpayers of Idaho*, it was recognized that pre-election review of an initiative is appropriate where statutorily prescribed procedures for placing the initiative on the ballot were not followed. 111 Idaho at 503, 725 P.2d at 527 (Donaldson,

C.J., specially concurring) (citing *Gumprecht v. City of Coeur d'Alene*, 104 Idaho 615, 661 P.2d 1214 (1983)). Unlike the instant case, *Associated Taxpayers of Idaho* did not involve objections to the procedures utilized in submitting the ballot measure to the electorate.

Further, *Nez Perce Tribe* does not foreclose pre-election challenges to ballot measures proposing constitutional amendments. Although the Nez Perce Tribe challenged the proposed constitutional amendment before the election in that case, their petition for extraordinary relief was filed only eleven days before the election. *See Nez Perce Tribe*, 125 Idaho at 38, 867 P.2d at 912. Therefore, Petitioners' challenges, both statutory and constitutional, to the publication methods utilized in this case should have been asserted prior to the election, as occurred in *Nez Perce Tribe*. Because Petitioners could have acted to correct the lack of publication of the "text" of the proposed amendment, and the allegedly misleading nature of the Statements of Meaning and Purpose and the statements for and against the proposed amendments before the election, "the effect of [the] favorable vote by the people is to cure defects in the form of the submission." *Penrod*, 82 Idaho at 525, 356 P.2d at 82.

After an election, the only ground upon which we will review the procedural challenges asserted here is the "misleading" standard set forth in *Penrod* where the Court stated:

> Defects which relate only to the form or procedure by which an amendment to the constitution is submitted to the electorate, and which are not such as to mislead the voters, are not sufficient to warrant the courts in holding the amendment void and defeating the will of the people after the people have clearly and knowingly approved the amendment as proposed. The expressed will of the people is not thus lightly to be disregarded and defeated on purely technical grounds.

*Id.* at 526, 356 P.2d at 83. Thus, it becomes clear that any procedural errors in submitting the ballot measure to the electorate are cured by the favorable election unless the defects are such as to mislead the voters. After reviewing the content of the Statements of Meaning and Purpose and the statements for and against H.J.R. 6, we find that they are not misleading. The materials published regarding H.J.R. 6, while not the actual text of the proposed amendments, sufficiently set forth the purpose and effect of the amendments to inform the public of its content. Likewise, the Statements of Meaning and Purpose sufficiently described the effect and impact of the proposed amendments, and the statements for and against the proposed amendments adequately reflected the principal arguments espoused by the proponents and opponents of the amendments.

Therefore, because the alleged procedural defects were not misleading, the statutory and constitutional challenges to these procedures are time barred because they were not presented before the election.

### B. H.J.R. 6 Violates Article 20, § 2 Of The Idaho Constitution.

H.J.R. 6 sought to amend two separate sections of Article 9, entitled "Education and Public Lands." H.J.R. 6 sought to amend section 4, entitled "Public School Fund Defined," to change the name of the Public School Fund, provide that the newly named fund would include proceeds from the sale of school lands, and allow proceeds from the sale of school lands to be used to acquire other lands. H.J.R. 6 also sought to amend section 8, entitled "Location and Disposition of Public Lands," by changing the phrase "*disposal* of public lands" to "*sale* of public lands." Petitioners argue that H.J.R. 6 improperly combined separate and incongruous amendments in violation of Article 20, § 2 of the Idaho Constitution. This type of challenge can be raised after the election because it deals with the substance of the amendments rather than procedures used to present a proposed amendment to the electorate. Indeed, prior cases dealing with Art. 20, § 2 challenges have involved challenges raised after the election. *See McBee v. Brady*, 15 Idaho 761, 100 P. 97 (1909); *Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948); *Penrod v. Crowley*, 82 Idaho 511, 356 P.2d 73 (1960);

*Idaho Water Resource Bd. v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976).

Article 20, § 2 provides that "[i]f two (2) or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately." Idaho Const. Art. XX, § 2. To determine whether a proposed state constitutional amendment complies with Article 20, § 2, the following test has been established:

> The determination whether a proposed change in the Constitution constitutes one or more amendments, it seems to us, depends upon whether the change as proposed relates to one subject and accomplishes a single purpose, and the true test should be, can the change or changes proposed be divided into subjects distinct and independent, and can any one of which be adopted without in any way being controlled, modified or qualified by the other? If not, then there are as many amendments as there are distinct and independent subjects, and it matters not whether the proposed change affects one or many sections or articles of the Constitution.

*Idaho Water Resource Bd. v. Kramer,* 97 Idaho 535, 550, 548 P.2d 35, 50 (1976) (quoting *McBee,* 15 Idaho at 779, 100 P. at 103). The Court has rephrased the *McBee* test stating that "the issue is not merely whether the matters in an amendment can be divided into separate questions, but whether the matters are 'incongruous and essentially unrelated.'" *Nez Perce Tribe,* 125 Idaho at 42, 867 P.2d at 916 (quoting *Idaho Water Resource Bd.,* 97 Idaho at 550, 548 P.2d at 50).

The object of the constitutional provision requiring two or more amendments to be submitted separately was "intended to prevent several inconsistent and conflicting propositions from being submitted to the voters in the same amendment, and forcing the voter to approve or reject such amendment as a whole." *McBee,* 15 Idaho at 772, 100 P. at 101. The purpose of the provision was "to prevent the pernicious practice of 'logrolling' in the submission of a constitutional amendment." *Keenan,* 68 Idaho at 446–47, 195 P.2d at 676.

■ Petitioners correctly point out that members of the electorate were deprived of the opportunity to vote separately on the proposed amendments to Article 9, § 4 and Article 9, § 8 because of their submission together in H.J.R. 6. In sum, a voter was not allowed to vote in favor of one of the proposals and to vote against the other; the voter was required to either support both proposals or to reject both, even though the voter may have truly favored only one of them.

Respondents, in their brief, state that "[a]ll of the language affecting the constitution relates to the subject of the sale of land and the use of the proceeds of the sale of land." However, we find that the subject of how school endowment land proceeds are invested differs essentially from the subject of whether auctions should take place regarding only sales, as opposed to leases and sales, of school endowment lands. We conclude that the proposed amendments to the two sections of Article 9 do not in any way depend upon one another. They are "incongruous and essentially unrelated," and consequently should have been submitted separately to the voters. *Kramer,* 97 Idaho at 552, 548 P.2d at 52. We therefore hold that the amendments proposed by H.J.R. 6 violate Article 20, § 2 of the Idaho Constitution.

## V.

## CONCLUSION

The statutory and constitutional challenges to the alleged procedural defects are time barred because they were not revised before the election. However, H.J.R. 6 was improperly submitted to the electorate in violation of Article 20, § 2, the "single subject rule" of the Idaho Constitution. Accordingly, the petition for writ of prohibition is granted. Costs on appeal to Petitioners.

## APPENDIX I

## H.J.R. 6

## A JOINT RESOLUTION

PROPOSING AMENDMENTS TO SECTION 4, ARTICLE IX, AND SECTION 8, ARTICLE IX, OF THE CONSTITUTION OF THE STATE OF IDAHO, RELATING TO THE PUBLIC SCHOOL PERMANENT

ENDOWMENT FUND AND ENDOW-
MENT LANDS, TO CHANGE THE NAME
OF THE PUBLIC SCHOOL FUND TO
THE PUBLIC SCHOOL PERMANENT
ENDOWMENT FUND, TO PROVIDE
THAT THE PUBLIC SCHOOL PERMA-
NENT ENDOWMENT FUND SHALL IN-
CLUDE PROCEEDS FROM THE SALE
OF SCHOOL LANDS AND AMOUNTS
ALLOCATED FROM THE PUBLIC
SCHOOL EARNINGS RESERVE FUND,
TO PROVIDE THAT PROCEEDS FROM
THE SALE OF SCHOOL LANDS MAY BE
DEPOSITED INTO A LAND BANK
FUND TO BE USED TO ACQUIRE OTH-
ER LANDS WITHIN THE STATE, TO
PROVIDE THAT IF PROCEEDS ARE
NOT USED TO ACQUIRE OTHER
LANDS WITHIN A TIME PROVIDED BY
THE LEGISLATURE THE PROCEEDS
SHALL BE DEPOSITED INTO THE
PUBLIC SCHOOL PERMANENT EN-
DOWMENT FUND ALONG WITH EARN-
INGS AND TO CHANGE THE WORD
DISPOSAL TO THE WORD SALE IN
THE CONTEXT OF THE DISPOSITION
OF ENDOWMENT LANDS; STATING
THE QUESTION TO BE SUBMITTED TO
THE ELECTORATE; DIRECTING THE
LEGISLATIVE COUNCIL TO PREPARE
THE STATEMENTS REQUIRED BY
LAW, AND DIRECTING THE SECRE-
TARY OF STATE TO PUBLISH THE
AMENDMENT AND ARGUMENTS AS
REQUIRED BY LAW.

Be It Resolved by the Legislature of the
State of Idaho:

SECTION 1. That Section 4, Article IX,
of the Constitution of the State of Idaho be
amended to read as follows:

SECTION 4. PUBLIC SCHOOL
*PERMANENT ENDOWMENT* FUND
DEFINED. The public school *permanent
endowment* fund of the state shall consist
of the proceeds *from the sale* of such lands
as have heretofore been granted, or may
hereafter be granted, to the state by the
general government, known as school
lands, and those granted in lieu of such;
lands acquired by gift or grant from any
person or corporation under any law or
grant of the general government; and of
all other grants of land or money made to

the state from the general government for
general educational purposes, or where no
other special purpose is indicated in such
grant; all estates or distributive shares of
estates that may escheat to the state; all
unclaimed shares and dividends of any cor-
poration incorporated under the laws of
the state; and all other grants, gifts, devis-
es, or bequests made to the state for gen-
eral educational purposes; *and amounts
allocated from the public school earnings
reserve fund. Provided however, that pro-
ceeds from the sale of school lands may be
deposited into a land bank fund to be used
to acquire other lands within the state for
the benefit of endowment beneficiaries. If
those proceeds are not used to acquire
other lands within a time provided by the
legislature, the proceeds shall be deposited
into the public school permanent endow-
ment fund along with any earnings on the
proceeds.*

SECTION 2. That Section 8, Article IX,
of the Constitution of the State of Idaho be
amended to read as follows:

SECTION 8. LOCATION AND DIS-
POSITION OF PUBLIC LANDS. It
shall be the duty of the state board of land
commissioners to provide for the location,
protection, sale or rental of all the lands
heretofore, or which may hereafter be
granted to or acquired by the state by or
from the general government, under such
regulations as may prescribed by law, and
in such manner as will secure the maxi-
mum long-term financial return to the in-
stitution to which granted or to the state if
not specifically granted; provided, that no
state lands shall be sold for less than the
appraised price. No law shall ever be
passed by the legislature granting any
privileges to persons who may have settled
upon any such public lands, subsequent to
the survey thereof by the general govern-
ment, by which the amount to be derived
by the sale, or other disposition of such
lands, shall be diminished, directly or indi-
rectly. The legislature shall, at the earli-
est practicable period, provide by law that
the general grants of land made by con-
gress to the state shall be judiciously locat-
ed and carefully preserved and held in
trust, subject to *sale* at public auction for

the use and benefit of the respective object for which said grants of land were made, and the legislature shall provide for the sale of said lands from time to time and for the sale of timber on all state lands and for the faithful application of the proceeds thereof in accordance with the terms of said grants; provided, that not to exceed on hundred sections of state lands shall be sold in any one year, and to be sold in subdivisions of not exceed three hundred and twenty acres of land to any on individual, company or corporation. The legislature shall have power to authorize the state board of land commissioners to exchange granted or acquired lands of the state on an equal value basis for other lands under agreement with the United States, local units of government, corporations, companies, individuals, or combinations thereof.

SECTION 3. The question to be submitted to the electors of the State of Idaho at the next general election shall be as follows:

"Shall Section 4, Article IX, and Section 8, Article IX, of the Constitution of the State of Idaho be amended as follows:

1. To change the name of the Public School Fund to the Public School Permanent Endowment Fund;

2. To provide that the Public School Permanent Endowment Fund shall include proceeds from the sale of school lands and amounts allocated from the Public School Earnings Reserve Fund;

3. To provide an exception that proceeds from the sale of school lands may be deposited into a Land Bank Fund to be used to acquire other lands within the state for the benefit of endowment beneficiaries, but if those proceeds are not used to acquire other lands within a time provided by the legislature the proceeds of the sale shall be deposited into the Public School Permanent Endowment Fund along with earnings on the proceeds; and

4. To change the word disposal to sale in reference to the disposition of certain lands?".

SECTION 4. The Legislative Council is directed to prepare the statements require

by Section 67–453, Idaho Code, and file the same.

SECTION 5. The Secretary of State is hereby directed to publish this proposed constitutional amendment and arguments as required by law.

## LEGISLATIVE COUNCIL'S STATEMENTS OF MEANING AND PURPOSE OF PROPOSED AMENDMENTS

### Section 4, Article IX, Meaning and Purpose of Proposed Amendment:

If adopted, the proposed amendment would:

• Change the name of the Public School Fund to the Public School Permanent Endowment Fund;

• Provide that proceeds from the sale of public school endowment lands and amounts allocated from the Public School Earnings Reserve Fund be included in the Public School Permanent Endowment Fund; and

• Provide an exception that proceeds from the sale of public school endowment lands may be deposited into a Land Bank Fund to be used to acquire other lands within the state for the benefit of endowment beneficiaries, which are Idaho's public schools. However, if those proceeds are not used to acquire other lands within a time provided by the legislature, the proceeds of the sale shall be deposited into the Public School Permanent Endowment Fund along with earnings on the proceeds.

Effect of Adoption:

The Public School Fund would be renamed the Public School Permanent Endowment Fund. That fund would include proceeds from the sale of lands of the public school endowment and amounts allocated from the Public School Earnings Reserve Fund. However, an exception would be provided so that proceeds from the sale of public school endowment lands may be deposited into a Land Bank Fund to be used to acquire other lands within the state for the benefit of Idaho's public schools. Land sale proceeds not used to acquire other lands within a time provided by the legislature would have to be deposited

into the Public School Permanent Endowment Fund along with earnings on the proceeds.

### Section 8, Article IX, Meaning and Purpose of Proposed Amendment:

To delete the word "disposal" and replace it with the word "sale" so the relevant phrase would read: "the general grants of land made by congress to the state shall be ... subject to sale at public auction."

Effect of Adoption:

The state constitution would require that sales of endowment lands be performed at public auctions.

### STATEMENTS *FOR* THE PROPOSED AMENDMENTS

#### Section 4, Article IX

1. Changing the name of the Public School Fund to the Public School Permanent Endowment Fund will promote accuracy and efficiency by clarifying the distinction between this fund and the other funds related to the public school endowment.

2. Providing that the Public School Permanent Endowment Fund would contain, among other things, proceeds from the sale of lands of the public school endowment if such lands are sold, will help clarify the contents of the fund and will prevent confusion in the future.

3. Creating a Land Bank Fund lets the state eliminate the current, cumbersome requirement that land exchanges must be performed to acquire land for the public school endowment. The Land Bank Fund would greatly enhance the performance of the public school endowment by enabling the state to sell unproductive endowment land and buy productive land. This would help the state maintain its endowment land base while increasing revenues from the land.

4. Placing money in the Land Bank Fund would not result in a loss of revenue. Money would be held in the Land Bank Fund only temporarily, and if not used to buy land, would be invested in the Public School Permanent Endowment Fund as other money would be.

5. The Land Bank Fund would not cause rampant sales of endowment lands. The state constitution limits sales of endowment land to no more than 100 sections (64,000 acres) of endowment land per year. Further, the state has always had the authority to sell endowment land and has sold over one million acres since Idaho became a state. Legal, social and political pressures limiting endowment land sales will still exist. The amendment does not alter state authority regarding land management.

#### Section 8, Article IX

1. Changing the word "disposal" to "sale" is necessary to clarify ambiguous terms.

2. The amendment uses the word "sale" of endowment lands because a sale is a permanent decision and should be addressed in the state's most permanent document, the state constitution. A lease is sometimes promoted as being within the term "disposal." However, a lease is not a permanent decision and should be distinguished from "sale."

3. The state constitution requires that endowment lands must be managed for the maximum long-term financial return. Endowment lands and the financial assets of the endowments are held in trust by the state for the endowment beneficiaries, to whom the state owes a fiduciary duty. By law, the state will operate under the "prudent investor" standard. Accordingly, competitive bidding for any lease of state land will be a key tool used to maximize the total return on endowment assets and to assure that the state is meeting its obligation to its beneficiaries.

4. The change reflects the fact that the word "disposal" historically has been interpreted to mean "sale." The statutory requirement that leases be offered at public auctions would still exist.

### STATEMENTS *AGAINST* THE PROPOSED AMENDMENTS

#### Section 4, Article IX

1. Changing the name of the Public School Fund to the Public School Permanent

Endowment Fund is unnecessary. People who deal with the public school endowment already know what the name refers to.

2. Requiring that the Public School Permanent Endowment Fund contain proceeds from the sale of lands of the public school endowment is unnecessary because those proceeds already have to be deposited into the permanent fund of the public school endowment.

3. Creating a Land Bank Fund and eliminating the requirement for land exchanges will turn the state into a land broker. The state should not be in the business of buying and selling land. The requirement for land exchanges helps limit how much the state deals in lands.

4. The Land Bank Fund will divert investment money from the Public School Permanent Endowment Fund, possibly resulting in lower revenues. Therefore, the Land Bank Fund will decrease the amount of growth in the financial assets of the public school endowment and will decrease revenues if this money is kept in an account where, although invested, it may not be invested in the best earning instruments.

5. Although the state constitution limits land sales to no more than 100 sections (64,000 acres) of state land per year, these amendments will promote land sales, thereby depleting the physical assets of the endowments and jeopardizing their financial health and that of the endowment beneficiaries.

### Section 8, Article IX

1. The word "disposal" may be ambiguous, but should remain open to different interpretations as time and circumstances require.

2. It does not matter that a sale might be permanent and a lease temporary. Both transactions alter the ownership or the use of endowment lands. The requirements for sales and leases addressed in the state constitution should remain unchanged.

3. The amendment will eliminate the constitutional requirement that a lease of lands of the public school endowment must be offered at a public auction. Thus, the change could eliminate competition that is necessary for getting the most revenue from state endowment lands. Combined with proposed changes to the Idaho Admission Bill, this amendment could result in leases of unlimited duration at below market rates. The change would decrease the accountability of state decision-makers and would perpetuate a deficiency in investment return on leases of endowment lands.

4. Although the word "disposal" has historically been interpreted to mean "sale," the definition of "disposal" is still disputed. A statutory requirement for leases to be offered at public auctions is inadequate because the legislature could change or eliminate that requirement.